McELROY, DEUTSCH, MULVANEY
   & CARPENTER, LLP
John T. Coyne, Esq. (*pro hac vice* forthcoming)
Nicholas K. Lagemann, Esq.
225 Liberty Street
36th Fl.
New York, NY  10281

DORSEY & WHITNEY LLP
Bruce R. Ewing
51 West 52nd Street
New York, New York 10019
(212) 415-9200

Attorneys for Plaintiffs,
GlaxoSmithKline LLC and
GlaxoSmithKline Consumer Healthcare (US) IP LLC

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GLAXOSMITHKLINE LLC and GLAXOSMITHKLINE CONSUMER HEALTHCARE (US) IP LLC, <br><br>           **Plaintiffs** <br><br> vs. <br><br> LACLEDE, INC.; MICHAEL PELLICO; and STEPHEN PELLICO, <br><br>           **Defendants.** | Civil Action No. <br><br><br> **REDACTED COMPLAINT AND** <br> **JURY DEMAND** |

Plaintiffs GlaxoSmithKline LLC ("GSK LLC") and GlaxoSmithKline Consumer Healthcare (US) IP LLC ("GSK IP") (collectively "GSK"), by way of complaint against defendants Laclede, Inc. ("Laclede"), Michael Pellico and Stephen Pellico (collectively, "Defendants"), state as follows:

I.       Nature of the Action

1.      Pursuant to an Asset Purchase Agreement (the "Agreement"), GSK's predecessor purchased from Laclede, ████████████████ the exclusive rights to market and distribute a line of over-the-counter products used for treatment of dry mouth under the BIOTENE trademark.   The Agreement contains ████████████████



2.      ████████████████

3.      ████████████████ GSK recently discovered that Laclede, which remains a Pellico-controlled company, has launched a line of products under the trademark SALIVEA that competes directly with BIOTENE, ████████████████ ████████████████

4.      Not only that, but Defendants have recently begun making advertising and promotional claims to health care professionals and consumers that are intended to create, and are actually creating, confusion in the marketplace.   Specifically, multiple health care

professionals have reported to GSK that they were deceived by mailers disseminated by Laclede into believing that SALIVEA is somehow approved or sponsored by, or otherwise connected to, the makers of BIOTENE, or that SALIVEA is a successor to and has replaced BIOTENE. Similar deceptive statements are also appearing on a website aimed at consumers that was recently launched by Laclede and is accessible at salivea.com. These willful, bad faith acts are violative of GSK's trademark rights and constitute unfair competition and false advertising under state and federal law.

5.      It is imperative that prompt action be taken to remedy the rampant confusion being caused in the marketplace as a result of Defendants' wrongdoing, which threatens to cause irreparable harm to GSK's BIOTENE business while simultaneously harming consumers.

II.    The Parties

6.      Plaintiff GSK LLC maintains a domestic headquarters at 184 Liberty Corner Road, Warren, New Jersey, and is one of the world's preeminent over-the-counter healthcare companies, with leading brands in the following categories: oral health, pain relief, nutrition and gastrointestinal, and skin health.

7.      Plaintiff GSK IP is a Delaware limited liability company that is affiliated with GSK LLC and maintains a registered address at 251 Little Falls Drive, Wilmington, Delaware. As detailed below, GSK is the owner of numerous BIOTENE trademarks and related marks.

8.      Defendant Laclede maintains a headquarters at 2103 East University Drive, Rancho Dominguez, California, and is engaged in, among other things, the development, marketing and sale of various over-the-counter and prescription medications and treatments in the following categories: oral health, ear, feminine health and veterinary.

9.     Defendant Michael Pellico is the President and Chief Executive Officer of Laclede and maintains an office at 2103 East University Drive, Rancho Dominguez, California.

10.     Defendant Stephen Pellico is the Vice-President and Secretary of Laclede and also maintains an office at 2103 East University Drive, Rancho Dominguez, California.

11.     Upon information and belief, defendants Michael Pellico and Stephen Pellico are the sole shareholders of Laclede.

III.     Jurisdiction and Venue

12.     This action includes causes of action for (i) infringement of federally registered trademarks under section 32 of the U.S. Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. §1114; (ii) unfair competition under section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A); (iii) false advertising under section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. §1125(a)(1)(B); and (iii) various claims under state law, for breach of contract, unfair competition and related causes of action.

13.     This Court has subject matter jurisdiction over the claims asserted herein under 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1332, 1338(a), 1338(b) and 1367.

14.     This Court has personal jurisdiction over all Defendants because, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮, they consented to such jurisdiction in this Court.  In addition, Defendants are all subject to personal jurisdiction in the State of New York under CPLR 302(a)(2) by virtue of their having perpetrated tortious conduct within the State of New York through the dissemination of mailers and related communications that are violative of GSK's trademark and related rights, and that have caused confusion among health care professionals within the State of New York.

15.   Venue is proper in this District under 28 U.S.C. § 1391(b) and because, ████

████████████████████, all parties consented to the jurisdiction of this Court.

IV.   <u>Facts Common to All Counts</u>

A.   <u>The Asset Purchase Agreement</u>

16.   On September 12, 2008, GSKLLC's predecessor, SmithKline Beecham

Corporation, d/b/a GlaxoSmithKline, entered into the Agreement ████████████████

████   A copy of the Agreement is attached as Exhibit A.

17.   All parties to the Agreement were sophisticated and represented by experienced

counsel.

18.   Per the Agreement, GSK purchased for ████████████████████



19.   The BIOTENE Products developed by Laclede and purchased by GSK are sold

over the counter (*i.e.* without a prescription) and used in the treatment of dry mouth, also known

as xerostomia, a condition that occurs when the body does not naturally produce sufficient saliva.

20.   At Article 1.1, the Agreement provides ████████████████████

████████████████████████████████

21.   Article 8.2 of the Agreement defines ████████████████

████████████████████████████████

22.    Article 8.2 of the Agreement defines "Other



23.    Also at Article 8.2, the Agreement defines



24.    At Article 8.12, the Agreement provides:

B.    BIOTENE Products and Trademarks

25.    GSK currently markets the following BIOTENE Products: BIOTENE Dry Mouth

Oral Rinse; BIOTENE Gentle Dry Mouth Oral Rinse; BIOTENE Oralbalance Moisturizing Gel;

BIOTENE Moisturizing Spray; BIOTENE Fluoride Toothpaste Fresh Mint; and BIOTENE

Fluoride Toothpaste Gentle Formula.

26.    In 2017, GSK's gross revenue on sales of the BIOTENE Products was

approximately

27.    GSK is the owner of twelve (12) active trademark registrations and applications

for BIOTENE and related marks in the United States and two-hundred eighty (280) such

6

registrations and applications in markets outside of the United States (the "BIOTENE Marks"). The U.S. BIOTENE Marks are listed on Exhibit A and include the word BIOTENE in a stylized, multicolor logo, and the image of a droplet that is used in connection with BIOTENE Products (the "BIOTENE Droplet").

28.     The majority of GSK's federal registrations for BIOTENE are incontestable under 15 U.S.C. § 1064, as indicated on Exhibit A.

29.     GSK expends substantial sums annually to advertise and promote the BIOTENE Products in the United States and around the world through electronic media, trade publications, newspapers, direct mail, television, radio and other special promotions.  In 2017, GSK spent over ▮▮▮▮▮▮▮ on advertising and promotion of the BIOTENE Products.

30.     As a result of the extensive advertising and promotion of the BIOTENE Products over many years, the BIOTENE Marks have become well-known by health care professionals and consumers as indicators of high quality products that originate with GSK.  The BIOTENE Marks distinguish the BIOTENE Products from those of others and are extremely valuable assets of GSK.

31.     The Agreement imposed no restrictions on GSK with respect to improvement or reformulation of BIOTENE.

32.     Following its acquisition of the BIOTENE Products and BIOTENE Marks, GSK has dedicated considerable financial resources and scientific expertise to improvement of the BIOTENE Products.

33.     Following extensive research, GSK determined that it was best to reformulate BIOTENE to contain pH levels of 5.5, which is close to that of natural saliva.

7

34.     In order to achieve the optimal pH level of 5.5 or higher, GSK determined that it was necessary to remove enzymes from the BIOTENE Products.

C.     <u>Defendants' Covenant Not To Compete</u>

35.     Michael Pellico was personally involved in the scientific research, development and testing, as well as manufacturing and marketing, of the BIOTENE Products prior to the effective date of the Agreement.

36.     By way of example of Michael Pellico's expertise, he traveled to Weymouth, England and gave a presentation to GSK employees regarding his ████████████████████████████

37.     Specifically, Michael Pellico detailed the formulations of the following products: (i) Biotene Moisturizing Mouthspray; (ii) Biotene Mouthwash; (iii) Biotene PBF Mouthwash; (iv) Biotene Oral Balance Liquid; (v) Biotene Oral Balance Gel; (vi) Biotene Oral Balance Mouthspray; (vii) Biotene Original Toothpaste; (viii) Biotene PBF Toothpaste; (ix) Biotene Sensitive Toothpaste; (x) Biotene Chewing Gum; and, (xi) Biotene PBF Chewing Gum. All of the aforementioned products contained a variety of the enzymes and proteins noted currently on Salivea's website, and, specifically, the aforementioned products that include "PBF" (*i.e.*, Plaque Bio Film) in their name contained mutanase and dextramase.

38.     Stephen Pellico also was personally involved in the scientific research, development and testing, as well as manufacturing and marketing, of the BIOTENE Products prior to the effective date of the Agreement.

39.   Article 4.16 of the Agreement, captioned  provides:

40.   Article 4.16(b) contains no 

41.   Michael and Stephen Pellico retain an ownership interest in Laclede and occupy executive positions at the company.  Any competition by Laclede, 

42.   Through their personal know-how regarding the development and composition of the BIOTENE Products, Michael and Stephen Pellico gained a competitive advantage that other new entrants to the marketplace would not have had,

9

43.     Persons other than Michael and Stephen Pellico who seek to compete with GSK in the area of dry mouth products would not have had, or been able to readily obtain, knowledge regarding the original BIOTENE Formulae.

44.     The original BIOTENE ingredients are in the public domain, but the original BIOTENE Formulae are not.

45.     In the Agreement, the Pellicos forever surrendered their right to profit from the sale of so-called "original BIOTENE" and were paid handsomely for it.  GSK is the only party with the right to sell the so-called "original BIOTENE" and, if it opts to discontinue such sales and move forward with what it believes to be a superior, enzyme-free product, it should be able to exercise its negotiated right to do so without interference by Defendants.

46.     Upon information and belief, Defendants have not secured the requisite approvals from the United States Food and Drug Administration for marketing the SALIVEA Products or registered the SALIVEA Products under Section 510(k) of the Food, Drug and Cosmetic Act, 21 U.S.C. 360(k).

D.     <u>Defendants' Flagrant Violation of</u> ███████████

47.     In or around March 2018, Laclede launched the SALIVEA line of products (the "SALIVEA Products"), which compete directly with the BIOTENE Products.

48.     Upon information and belief, Michael Pellico was and is directly or indirectly involved in the scientific research, development and testing, manufacturing and marketing of the SALIVEA Products.

49.     Upon information and belief, Stephen Pellico was and is directly or indirectly involved in the scientific research, development and testing, and the manufacturing and marketing of the SALIVEA Products.

50.     Upon information and belief, in or around mid-April 2018, Defendants made the SALIVEA Products available for purchase by consumers on various websites, including, www.amazon.com, and in various stores, including Walgreen's pharmacies.

51.     Defendants' actions █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

52.     As a result of Defendants' violations of the Agreement, they have been unjustly enriched by revenues generated from sales of SALIVEA.

53.     GSK, which has fully performed all of its obligations under the Agreement, has been damaged by Defendants' violation of the Agreement.

E.      Defendants' Infringement of BIOTENE Marks, Unfair Competition and False Advertising

54.     In or around April 2018, Defendants caused fliers promoting SALIVEA to be mailed to health care professionals, including dentists, throughout the United States. Copies of two (2) such mailers are attached hereto, respectively, as Exhibit B, which seeks to promote SALIVEA Extra Gentle Toothpaste (the "SALIVEA Toothpaste Mailer"), and Exhibit C, which seeks to promote SALIVEA Extra Gentle Mouthwash (the "SALIVEA Mouthwash Mailer").

55.     Defendants are also engaged in the marketing and sale of SALIVEA Hydrating Mouth Spray, which is also included in the line of SALIVEA Products.

56.     In addition, in early 2018, Defendants created a website accessible at www.salivea.com to promote various SALIVEA products (the "SALIVEA Website"). Excerpts from the Salivea Website are attached hereto as Exhibit D. Collectively, the SALIVEA Toothpaste Mailer, the SALIVEA Mouthwash Mailer and the SALIVEA Website will be referred to as "SALIVEA Advertisements."

11

(i).    SALIVEA Toothpaste Mailer

57.    The SALIVEA Toothpaste Mailer promotes SALIVEA Extra Gentle Toothpaste

as being marketed "From the Creators of ORIGINAL BIOTENE," with the word BIOTENE

prominently appearing in a large and stylized font, with a droplet shape filling the hollowed

section of the letter "o," just as the trademark appears on GSK's BIOTENE Products. In

addition, the SALIVEA trademark appears in the SALIVEA Toothpaste Mailer in a blue-and-red

color combination, the same color combination GSK uses with BIOTENE. The top of the

SALIVEA Toothpaste Mailer states "Back Again, Salivary Enzymes and Components –

Essential for Dry Mouth Care."

58.    The "From the Creators" phrase falsely suggests an affiliation between the makers

of SALIVEA and BIOTENE, and that GSK, the source of BIOTENE, has endorsed or otherwise

approved SALIVEA. Indeed, because the SALIVEA Toothpaste Mailer does not disclose that

BIOTENE was reformulated by GSK, or that the "creators" of the current BIOTENE Products

are not the "creators" of SALIVEA, it creates the false impression that the respective products

are sponsored or endorsed by the same party.

59.    The use of the plural, "creators," as distinct from the singular, "creator," adds to

the deceptiveness of the SALIVEA Toothpaste Mailer, as it is unclear whether "creators" means

Michael and Stephen Pellico together; the Pellicos in conjunction with Laclede; Laclede in

conjunction with GSK; or some other combination.

60.    The SALIVEA Toothpaste Mailer also states: "SALIVEA utilizes the same

ingredients as the ORIGINAL BIOTENE – The Proven and Loved Formula," with "ORIGINAL

BIOTENE" appearing in extremely prominent fashion, in the middle of the Mailer. The words

"Back Again" at the top of the Mailer also reinforce the impression that SALIVEA is a

12

supposedly new and improved BIOTENE. But, as set forth above, the BIOTENE Formulae were among the assets sold by Laclede to GSK for substantial consideration.

61.    The SALIVEA Toothpaste Mailer, using a small, barely perceptible font running vertically along the left margin, states "BIOTENE is a trademark owned by GlaxoSmithKline."

62.    The SALIVEA Toothpaste Mailer does not identify Laclede as the manufacturer or distributor of SALIVEA and does not advise the reader of the lack of affiliation between GSK and Laclede and, thereby, creates further confusion as to the source, sponsorship or approval of SALIVEA by GSK.

63.    The SALIVEA Toothpaste Mailer also does not describe BIOTENE as a "competing" brand, emanating from a "rival," or even "another" or a "different" manufacturer, or contain any words to that effect.

64.    The statements in the SALIVEA Toothpaste Mailer and the frequent, prominent uses of the BIOTENE trademark therein are likely to confuse, or have confused, consumers and health care professionals as to the source, sponsorship, affiliation or connection of SALIVEA to BIOTENE. Upon information and belief, such actual and likely confusion is the product of Defendants' deliberate desire to cause such confusion in the marketplace and their actions were undertaken in bad faith.

65.    The statements in the SALIVEA Toothpaste Mailer and the frequent, prominent uses of the BIOTENE trademark therein communicate the false message that SALIVEA is a successor to BIOTENE and has replaced BIOTENE. Such statements are material to both the purchasing decisions of consumers and the recommendations of health care professionals, and are likely to deceive both consumers and health care professionals. Upon information and belief, the false message communicated by the SALIVEA Toothpaste Mailer was the product of

Defendants' willful and intentional desire to mislead both consumers and health care professionals.

66.     The SALIVEA Toothpaste Mailer includes the "®" symbol purporting to denote the registered status of the SALIVEA trademark.

67.     Upon information and belief, Defendants' representation regarding the registered status of the SALIVEA trademark was and is false, inasmuch as an application to register SALIVEA with the U.S. Patent and Trademark Office for toothpaste was and remains pending, but the mark has not yet been registered.

68.     The unregistered status of the SALIVEA trademark was known or should have been known to Defendants as of the date when the SALIVEA Toothpaste Mailer was distributed.

(ii).     <u>SALIVEA Mouthwash Mailer</u>

69.     The SALIVEA Mouthwash Mailer promotes SALIVEA Extra Gentle Mouthwash and contains <u>nine</u> references to BIOTENE, including, first and second, a prominent visual image of a BIOTENE Dry Mouth Oral Rinse bottle accompanied by a list of "CURRENT BIOTENE Changes."

70.     The third, fourth and fifth references to BIOTENE in the SALIVEA Mouthwash Mailer appear in the following paragraph:

> Over 35 years ago, Laclede developed BIOTENE enzyme toothpaste and mouthwash that became the #1 brand for dry mouth. BIOTENE was acquired by GSK Company and was reformulated. After years of perfecting formulas, <u>we now introduce</u> SALIVEA mouthwash and toothpaste that utilize the Proven Enzyme Technology as in the ORIGINAL BIOTENE. (emphasis added)

14

71.    The use of the phrase "we now introduce" in the above-excerpted paragraph is particularly misleading inasmuch as it creates the false impression that "we" refers to GSK, not Laclede.

72.    Sixth, the uppermost portion of the SALIVEA Mouthwash Mailer prominently states in large, capital lettering: "DID YOU KNOW BIOTENE HAS CHANGED?" The document goes on to compare the "formulas" of the SALIVEA and BIOTENE mouthwashes under the following headers featuring the seventh and eighth references to BIOTENE in this Mailer: "SALIVEA Mouthwash Utilizing ORIGINAL BIOTENE Formula" and "ORIGINAL BIOTENE Formula the #1 Recommended Brand for Dry Mouth". Nowhere in this Mailer does it indicate that BIOTENE and SALIVEA are competing products. To the contrary, these and the other BIOTENE references communicate the false message that the producer of BIOTENE Mouthwash has elected to replace that product with SALIVEA, and that BIOTENE has been discontinued.

73.    The misleading nature of the SALIVEA Mouthwash Mailer is amplified by the references, of which there are two, to BIOTENE as the "#1 brand for dry mouth" which serves no objective other than to confuse and mislead consumers and health care professionals. The average consumer and health care professional are highly likely to interpret the "#1" references as being complimentary in nature and therefore originating with GSK or the makers of BIOTENE. The effect of the repeated "#1" references, and the overall impression of the SALIVEA Mouthwash Mailer, is to conceal the competitive relationship between GSK and Laclede and to falsely suggest an affiliation or connection between the respective products in a bad-faith effort by Defendants to capitalize on the goodwill of the BIOTENE Products and confuse the public.

74.     The SALIVEA Mouthwash Mailer purports to list, mostly by chemical name only, the twenty-one (21) ingredients of "SALIVEA Mouthwash," the nineteen (19) ingredients of "Original BIOTENE," and the fourteen (14) ingredients of "Current BIOTENE," but fails to even attempt an explanation of the significance of the differences in ingredients, rendering the respective lists meaningless to the average consumer.  But what these lists actually do is create the false impression of an affiliation or connection between the sellers of BIOTENE and SALIVEA, or that the maker of BIOTENE, GSK, has endorsed SALIVEA.

75.     The ninth reference to BIOTENE in the SALIVEA Mouthwash Mailer is contained in the same, small, barely perceptible sentence running vertically along the left margin, stating that "BIOTENE is a trademark owned by GlaxoSmithKline" that appears in the SALIVEA Toothpaste Mailer.  Once again, this text does not identify Laclede as the manufacturer or distributor of SALIVEA and does not advise the reader of the lack of affiliation between GSK and Laclede and, thereby, creates further confusion as to the source, sponsorship or approval of SALIVEA by GSK.

76.     The statements in the SALIVEA Mouthwash Mailer and the ubiquitous use of the BIOTENE trademark therein are likely to confuse, or have confused, consumers and health care professionals as to the source, sponsorship, affiliation or connection of SALIVEA to BIOTENE. Upon information and belief, such actual and likely confusion is the product of Defendants' deliberate desire to cause such confusion in the marketplace and their actions were undertaken in bad faith.

77.     The statements in the SALIVEA Mouthwash Mailer and the ubiquitous use of the BIOTENE trademark therein communicate the false message that SALIVEA is a successor to BIOTENE and has replaced BIOTENE.  Such statements are material to both the purchasing

decisions of consumers and the recommendations of health care professionals, and are likely to deceive both consumers and health care professionals. Upon information and belief, the false message communicated by the SALIVEA Toothpaste Mailer was the product of Defendants' willful and intentional desire to mislead both consumers and health care professionals.

78.     And, once again, the SALIVEA Mouthwash Mailer repeatedly and wrongfully uses the "®" symbol alongside the SALIVEA trademark to communicate the false message that such trademark has been registered with the U.S. Patent & Trademark Office, when it has not. Indeed, there is not even a pending application on file with the U.S. Patent & Trademark Office to register the SALIVEA trademark for mouthwash or any product other than toothpaste.

(iii).     <u>SALIVEA Website</u>

79.     The SALIVEA Website states prominently at the top of the home page "It's Back! The Original Formula That Made Biotene #1 for Dry Mouth," immediately below which appears the statement "From the Creators of BIOTENE," with BIOTENE appearing in the distinctive blue-and-red logo GSK uses on BIOTENE Products. Meanwhile, yet again, the SALIVEA trademark appears in the same blue-and-red color combination. Once again, this combination of statements and the multiple references to BIOTENE are likely to cause consumers and health care professionals into believing falsely that there is an affiliation or connection between SALIVEA and BIOTENE that does not exist, or that GSK has endorsed or approved SALIVEA when it has not. Such statements also communicate the false message that SALIVEA is a successor to BIOTENE and that BIOTENE has been discontinued.

80.     Other uses of BIOTENE on the SALIVEA Website are equally likely to confuse. On the page entitled "Why Salivea?" it states as follows:

17

**Proven Enzyme Technology**

Over 35 years ago, Laclede developed Biotene®*enzyme toothpaste and mouthwash that became The #1 Brand for Dry Mouth. Biotene® was later acquired by the GSK Company and was reformulated.

We Listened! We brought back salivary enzymes: *Lysozyme, Lactoperoxidase, Lactoferrin, Glucose Oxidase, Dextranase.*

81.     Once again, the use of the phrases "We Listened!" and "We brought back" in this paragraph are highly misleading, inasmuch as they create the false impression that "we" refers to GSK, not Laclede.  This false impression is reinforced by the multiple references to BIOTENE and/or GSK in the text, alongside which appears a prominent image of a water droplet that borrows from the appearance of the BIOTENE Droplet.

82.     The statements on the SALIVEA Website, the ubiquitous use of the BIOTENE trademark thereon, and the use of a water droplet that could only, in this context, call to mind the BIOTENE Droplet, are likely to confuse consumers and health care professionals as to the source, sponsorship, affiliation or connection of SALIVEA to BIOTENE.  Upon information and belief, such actual and likely confusion is the product of Defendants' deliberate desire to cause such confusion in the marketplace, and their actions were undertaken in bad faith.

83.     The statements on the SALIVEA Website, the ubiquitous use of the BIOTENE trademark thereon, and the use of a water droplet that could only, in this context, call to mind the BIOTENE Droplet, communicate the false message that SALIVEA is a successor to BIOTENE and has replaced BIOTENE.  Such statements are material to both the purchasing decisions of consumers and the recommendations of health care professionals, and are likely to deceive both consumers and health care professionals.  Upon information and belief, the false message

18

communicated by the SALIVEA Toothpaste Mailer was the product of Defendants' willful and intentional desire to mislead both consumers and health care professionals.

(iv).   Actual Confusion

84.   The SALIVEA Advertisements have created actual confusion as to the source or sponsorship of SALIVEA and the affiliation or connection between GSK and Laclede.

85.   Beginning in April 2018, GSK has been contacted by approximately twenty (20) recipients of SALIVEA Advertisements who inquired about, among other things, whether SALIVEA was a GSK product, whether GSK was replacing BIOTENE with SALIVEA, where information regarding SALIVEA could be found on GSK's website, and whether GSK could provide samples of SALIVEA.

86.   Among the examples of such communications are the following:

- On April 3, 2018, a periodontist in Fayetteville, Georgia asked a GSK oral healthcare consultant for samples of the "new Biotene product" she had seen advertised in the SALIVEA Toothpaste Mailer and the SALIVEA Mouthwash Mailer.

- On April 3, 2018, an employee of a dental practice in Pensacola, Florida emailed GSK advising that "I got a paper flyer for Salivea today. Should we use this in place of Biotene"? A copy of the e-mail is attached as Exhibit E with names redacted.

- On April 4, 2018, a dentist in Pittsburgh, Pennsylvania asked a GSK oral healthcare consultant whether SALIVEA was a GSK product or an extension of the BIOTENE brand.

- On April 4, 2018, an employee of a dental practice in Auburn, California requested a meeting with a GSK oral healthcare consultant "to discuss new Biotene." The employee advised the GSK representative that she had requested the meeting because of a SALIVEA mailer.

- On April 9, 2018, an employee of a dental practice in Columbus, Ohio emailed GSK and inquired about whether SALIVEA was a GSK product and whether samples were available. A copy of the email with names redacted is attached as Exhibit F

- On April 9, 2018, a dentist in Brookfield, Connecticut showed a GSK oral healthcare consultant the SALIVEA Toothpaste Mailer and the SALIVEA Mouthwash Mailer and advised that she thought they came from GSK, and that SALIVEA was a GSK product.

- On April 11, 2018, the manager of a dental practice located in Miller Place, New York asked a GSK oral healthcare consultant whether GSK was discontinuing BIOTENE, because that was the impression she took away from the mailer for SALIVEA that she had received.

87.    Further, on April 4, 2018, one of GSK's Senior Oral Healthcare Consultants received the following voicemail from a dentist's office in Oak Forest, Illinois:

Hey [name removed], it's [name removed] at [name removed] in Oak Forest.

Thank you for our Lunch and Learn. Everybody had a good time. Uhh, we got a

card in the mail today about the new Salivea. Uhh, so that looks cool. I will make

sure the hygienist all get to see this, but I was wondering if there are samples of

that stuff already or not. I do not see that this says it is available now at

Walgreen's, so we can always refer people. But, one of the girls wanted to know

if the Salivea is going to come in the gel and the gum and all that as well. So, if

you have a chance to just give me a buzz let me know I'd appreciate it. Our

number here is [phone number removed]. Thank you.

A copy of the intelligent verbatim transcription of this call, with names redacted, is attached as Exhibit G.

88.    Such communications reflecting confusion on the part of various health care professionals were directed to GSK by persons in the following states: California, Connecticut, Georgia, Illinois, Indiana, Oklahoma, Ohio, New York, North Carolina, Pennsylvania and Texas.

20

89.     Through research, GSK has determined that approximately 63% of consumers' first purchases (a/k/a "trial purchases") of oral care products are traceable to recommendations by health care professionals.

90.     GSK promotes the BIOTENE Products to health care professionals via (a) personal sales calls and (b) direct mailings. Due to cost considerations, GSK does not place sales representatives in all areas of the United States. Rather, GSK makes that investment only in regions determined by GSK to have the capacity to generate significant return on the investment ("high density areas"). In other areas, GSK communicates with health care professionals almost exclusively via direct mailers.

91.     All of the aforementioned incidents of actual confusion as to the source of SALIVEA were brought to GSK's attention via health care professionals who had previous dealings with a GSK sales representative. As noted above, GSK salespersons are active only in high density areas. To the extent that health care professionals in high density areas were confused, and will be confused, by the SALIVEA Advertisements, each such incidence of confusion on the part of health care professionals is likely to have an exponential effect on the purchasing decisions of consumers.

92.     As set forth above, any competition by Defendants violates the Agreement, but even if Defendants have the contractual right to compete and engage in comparative advertising, Defendants' use of the BIOTENE Marks and the false and misleading advertising they have distributed goes well beyond what is necessary to identify GSK's products for purposes of comparison.

93.     Additionally, Defendants' use of the BIOTENE Marks in the SALIVEA Advertisements improperly suggests sponsorship or endorsement of SALIVEA by GSK and the

existence of an affiliation between GSK and Laclede with respect to the marketing and sale of SALIVEA.

94.     The following additional factors have created and will continue to create confusion regarding source, affiliation, connection, sponsorship and endorsement:

(a)     Enhanced by GSK's substantial expenditures and efforts in the areas of advertising, promotion, research and development, the BIOTENE Marks are strong and the BIOTENE Products have enjoyed commercial success since their acquisition by GSK;

(b)     The BIOTENE Products and SALIVEA are competitively proximate, in that they target the same class of consumers – those who suffer from dry mouth – and are priced and advertised similarly;

(c)     The SALIVEA Advertisements have generated actual confusion, as demonstrated by the numerous unsolicited communications received by GSK;

(d)     Defendants' actions clearly were undertaken in bad faith and aimed at capitalizing on the goodwill and reputation of the BIOTENE Products;

(e)     The BIOTENE Products are of the highest quality, with GSK continually having expended considerable sums and effort to seek to ensure that sufferers of dry mouth achieve maximum benefits; and

(f)     As set forth above, the SALIVEA Advertisements have generated substantial confusion among health care professionals who have some sophistication with respect to oral care products, making it highly likely that consumers, who are generally less-sophisticated, will be even more confused if exposed to Defendants' deceptive statements.

95.     In addition, the false message communicated by the SALIVEA Advertisements in interstate commerce to a substantial percentage of their targeted recipients is that SALIVEA is a successor to and has replaced BIOTENE. This misleading claim has had a material impact on the recommendations and purchasing decisions of healthcare professionals and consumers with respect of BIOTENE and has caused competitive and commercial injury to GSK.

96.     GSK has no adequate remedy at law for any of the misconduct described above and will suffer irreparable harm in the absence of the relief sought herein.

<u>First Count</u>

<u>(Infringement of GSK's Registered BIOTENE Trademarks – Lanham Act, 15 U.S.C. §1114)</u>

97.     GSK repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

98.     GSK is the owner of all right, title and interest in and to the BIOTENE Marks, which are distinctive, enforceable and registered with the U.S. Patent & Trademark Office.

99.     As parties to the Agreement, Defendants are on notice of GSK's ownership of the BIOTENE Marks.

100.    As a result of Defendants' aforementioned actions, health care professionals, consumers and prospective consumers of the BIOTENE Products have been or will continue to be confused, deceived and misled by Defendants' actions and erroneously believe that there is an affiliation, sponsorship, connection or endorsement of SALIVEA by GSK when, in fact, there is none.

101.    Through Defendants' aforementioned actions, the BIOTENE Marks have been infringed in violation of section 32 of the Lanham Act, 15 U.S.C. §1114, to the detriment of GSK and to the improper benefit of Defendants.

102.    Defendants' infringing actions were undertaken without the permission, license or consent of GSK.

103.    Defendants' acts of infringement were committed with full knowledge and in conscious disregard of the rights of GSK and were willful, intentional and deliberate, undertaken in bad faith with the intent to trade on the goodwill of the BIOTENE Products and BIOTENE Marks, making this an exceptional case within the meaning of 15 U.S.C. §1117.

23

104. As a proximate result of Defendants' actions, GSK has suffered and will continue to suffer significant damage to its business, goodwill, reputation, profits and the strength of the BIOTENE Marks. The injury to GSK is ongoing and irreparable and is not fully compensable by an award of monetary damages.

105. GSK is entitled to a preliminary and permanent injunction against Defendants as well as other remedies available under the Lanham Act, including, but not limited to, compensatory damages, treble damages, corrective advertising, disgorgement of profits, pre-and post-judgment interest, and attorneys' fees and costs.

106. As a result of defendants' acts of infringement, GSK has suffered damages and will continue to suffer damages if defendants are not enjoined from such conduct.

**Second Count**
**(Unfair Competition – Lanham Act, 15 U.S.C. §1125(a)(1)(A))**

107. GSK repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

108. Defendants' actions, as described above, have caused, and will continue to cause, confusion, mistake and deception as to the source, affiliation, connection, sponsorship or endorsement of the SALIVEA Products.

109. As a result of Defendants' improper and unauthorized actions, members of the consuming public and health care professionals have formed, or likely will form, the belief that SALIVEA is affiliated with or endorsed by GSK or that GSK is the source or sponsor of the SALIVEA Products.

110. Defendants' actions constitute unfair competition in violation of section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. §1125(a)(1)(A).

111.    Defendants' acts of unfair competition were committed with full knowledge and in conscious disregard of the rights of GSK and were willful, intentional and deliberate, undertaken in bad faith and with the intent to trade on the goodwill of the BIOTENE Products and BIOTENE Marks, making this an exceptional case within the meaning of 15 U.S.C. §1117.

112.    As a proximate result of Defendants' actions, GSK has suffered and will continue to suffer significant damage to its business, goodwill, reputation, profits and the strength of the BIOTENE Marks.  The injury to GSK is ongoing and irreparable and is not fully compensable by an award of monetary damages.

113.    GSK is entitled to a preliminary and permanent injunction against Defendants, as well as other remedies available under the Lanham Act, including, but not limited to, compensatory damages, treble damages, corrective advertising, disgorgement of profits, pre- and post- judgment interest, and attorneys' fees and costs.

<u>Third Count</u>

<u>(False Advertising – Lanham Act, 15 U.S.C. §1125(a)(1)(B))</u>

114.    GSK repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

115.    The SALIVEA Advertisements have been disseminated by Defendants in interstate commerce for purposes of commercial advertising or promotion.

116.    The SALIVEA Advertisements communicate the false and misleading message that SALIVEA is a successor to and has replaced BIOTENE.

117.    The SALIVEA Advertisements have had and are likely to have a material impact on the purchasing decisions of consumers and health care professionals, as well as the

recommendations of health care professionals to consumers with respect to dry mouth treatment products.

118.    The SALIVEA Advertisements have caused and are likely to cause competitive and commercial harm to GSK.

119.    Defendants' actions constitute false advertising in violation of section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. §1125(a)(1)(B).

120.    Defendants' acts of false advertising were committed with full knowledge and in conscious disregard of the rights of GSK and were willful, intentional and deliberate, undertaken in bad faith and with the intent to communicate false and misleading claims to consumers and health care professionals, making this an exceptional case within the meaning of 15 U.S.C. §1117.

121.    As a proximate result of Defendants' actions, GSK has suffered and will continue to suffer significant damage to its business, goodwill, reputation and profits.  The injury to GSK is ongoing and irreparable and is not fully compensable by an award of monetary damages.

122.    GSK is entitled to a preliminary and permanent injunction against Defendants, as well as other remedies available under the Lanham Act, including, but not limited to, compensatory damages, treble damages, corrective advertising, disgorgement of profits, pre- and post- judgment interest, and attorneys' fees and costs.

Fourth Count<br>(Breach of Asset Purchase Agreement)

123.    GSK repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

124.   The actions of Michael Pellico and Stephen Pellico, as described above and implemented through their direct or indirect control of Laclede, ████████████████████ ████████████████████████████████████████████

125.   As a result of the aforedescribed violations of the Agreement, GSK has suffered damages and will continue to suffer damages if Defendants are not enjoined from such violations.

## Fifth Count
### (Violation of Covenant of Good Faith and Fair Dealing Implied in Asset Purchase Agreement)

126.   GSK repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

127.   The actions of Michael Pellico and Stephen Pellico, as described above and implemented through their direct or indirect control of Laclede, violate the covenant of good faith and fair dealing implied in the Agreement.

128.   As a result of the aforedescribed violations of the covenant of good faith and fair dealing implied in the Agreement, GSK has suffered damages and will continue to suffer damages if Defendants are not enjoined from such conduct.

## Sixth Count
### (Violation of Covenant Not To Compete Implied By Law)

129.   In exchange for payment of ██████████████████████████ ████████████████████████ GSK reasonably expected that Laclede, Michael Pellico and Stephen Pellico, consistent with the covenants implied by law, would refrain from solicitation of the same class of customers that they had targeted while marketing and selling the BIOTENE line of products.

130.    As a result of the aforedescribed violations of covenants implied by law, GSK has suffered damages and will continue to suffer damages if Defendants are not enjoined from such conduct.

Seventh Count
(Tortious Interference With Prospective Economic Advantage)

131.    GSK repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

132.    The actions of Laclede, Michael Pellico and Stephen Pellico, as described above and committed with malice, constitute unlawful interference with the economic advantage that GSK expected, and to which it was entitled, through the sale of BIOTENE Products.

133.    As a result of the aforedescribed tortious conduct, GSK has suffered damages and will continue to suffer damages if Defendants are not enjoined from such conduct.

Eighth Count
(Unjust Enrichment)

134.    GSK repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

135.    As a result of the foregoing unlawful and improper conduct, Defendants have been unjustly enriched to the detriment of GSK.

136.    It would be inequitable for Defendants to retain the monies that they improperly acquired through the aforedescribed conduct.

137.    The monies unjustly acquired by Defendants through the actions described above should be disgorged and remitted to GSK.

<u>Ninth Count</u>
<u>(New York General Business Law, Section 349 – Deceptive Practices)</u>

138.   GSK repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

139.   Defendants' actions, as described above, constitute deceptive practices and are unlawful under New York General Business Law, Section 349 ("Section 349").

140.   Defendants' actions were willful and have deceived and caused harm to the public and have resulted in injury to GSK's business, reputation and goodwill.

141.   GSK has no adequate remedy at law and will continue to suffer irreparable harm unless Defendants are enjoined from engaging in such wrongful conduct.

142.   As a result of Defendants' willful violation of Section 349, GSK is entitled to injunctive relief, and an award of damages, attorneys' fees and costs of suit.

<u>Tenth Count</u>
<u>(New York General Business Law, Section 350 – False Advertising)</u>

143.   GSK repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

144.   Defendants' actions, as described above, constitute false advertising and are unlawful under New York General Business Law, Section 350 ("Section 350").

145.   Defendants' actions were willful and have deceived and caused harm to the public and have resulted in injury to GSK's business, reputation and goodwill.

146.   GSK has no adequate remedy at law and will continue to suffer irreparable harm unless Defendants are enjoined from engaging in such wrongful conduct.

147.   As a result of Defendants' willful violation of Section 350, GSK is entitled to injunctive relief, and an award of damages, attorneys' fees and costs of suit.

Eleventh Count
(Common Law Trademark Infringement)

148.    GSK repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

149.    Defendants' actions, as described above, constitute trademark infringement in violation of the common law of the State of New York.

150.    Defendants' actions were willful and have deceived and caused harm to the public and have resulted in injury to GSK's business, reputation and goodwill.

151.    GSK has no adequate remedy at law and will continue to suffer irreparable harm unless Defendants are enjoined from engaging in such wrongful conduct.

152.    As a result of Defendants' willful common law trademark infringement, GSK is entitled to injunctive relief, and an award of damages, attorneys' fees and costs of suit.

Twelfth Count
(Common Law Unfair Competition)

153.    GSK repeats and realleges all of the allegations contained in the preceding paragraphs as if fully set forth herein.

154.    Defendants' actions, as described above, constitute unfair competition in violation of the common law of the State of New York.

155.    Defendants' actions were undertaken in bad faith and have deceived and caused harm to the public and have resulted in injury to GSK's business, reputation and goodwill.

156.    GSK has no adequate remedy at law and will continue to suffer irreparable harm unless Defendants are enjoined from engaging in such wrongful conduct.

157.    As a result of Defendants' willful acts of unfair competition, GSK is entitled to injunctive relief, and an award of damages, attorneys' fees and costs of suit.

WHEREFORE, GSK requests entry of judgment

    a.     Preliminarily and permanently enjoining Defendants from distributing or marketing any oral care product for the treatment of dry mouth;

    b.     Preliminarily and permanently enjoining Defendants from infringing the BIOTENE trademark or otherwise engaging in unfair competition with GSK;

    c.     Requiring Defendants to affirmatively disclose to the public that SALIVEA is not endorsed or sponsored by GSK and take all other necessary corrective actions to dispel the erroneous impressions formed as a result of their deceptive conduct;

    d.     Directing the destruction of all infringing articles pursuant to 15 U.S.C. §1118;

    e.     Requiring Defendants, within twenty (20) days of service of an injunction granting the above-referenced relief, to serve an affidavit detailing the manner of compliance with the injunction;

    f.     Awarding compensatory and punitive damages to GSK;

    g.     Awarding treble damages and attorneys' fees to GSK pursuant to 15 U.S.C. §1117;

    h.     Directing an accounting of profits and requiring Defendants to disgorge and remit to GSK all profits realized from the distribution and marketing of SALIVEA;

    i.     Awarding GSK such sums as it will incur in order to disseminate corrective advertising that aims to cure the confusion caused in the marketplace

by the SALIVEA Advertisements, and to remedy the false and misleading

messages communicated by such Advertisements to consumers and health care

professionals;

        j.        Awarding prejudgment and postjudgment interest and attorneys'

fees and costs; and

        k.        Granting such other relief as the Court deems appropriate.

<u>JURY DEMAND</u>

GSK demands a trial by jury on all issues so triable.

                    McELROY, DEUTSCH, MULVANEY
                       & CARPENTER, LLP
                    Attorneys for Plaintiffs,
                    GlaxoSmithKline LLC and
                    GlaxoSmithKline Consumer Healthcare (US) IP LLC

                    By:___s/Nicholas K. Lagemann_____
Dated: June 1, 2018                    Nicholas K. Lagemann, Esq.
3598463

Of Counsel:

DORSEY & WHITNEY LLP
Bruce R. Ewing
51 West 52nd Street
New York, New York 10019
(212) 415-9200