UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                         :

GLAXOSMITHKLINE LLC, et al.,        :
                         :

            Plaintiffs,      :          18-CV-4945 (JMF)
                         :
      -v-               :       <u>OPINION AND ORDER</u>
                         :
LACLEDE, INC., et al.,           :
                         :
            Defendants.     :
                         :
-------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In this action, GlaxoSmithKline LLC and GlaxoSmithKline Consumer Healthcare (US)

IP LLC (together, "GlaxoSmithKline") bring intellectual property claims — namely, claims for

trademark infringement, false advertising, deceptive practices, and unfair competition, under

New York and federal law — as well as common law tort and breach-of-contract claims against

Laclede, Inc. ("Laclede"), and its only two shareholders, Michael Pellico and Stephen Pellico.

*See* Docket No. 26 ("Compl.").  Plaintiffs' arguments turn principally on a 2011 Asset Purchase

Agreement in which Plaintiffs agreed to purchase from Laclede the rights to BIOTENE, a line of

over-the-counter medicines used to treat dry mouth.  *See id.*, Ex. A ("APA").  Plaintiffs claim

that Defendants breached that agreement when, in 2018, Defendants launched SALIVEA, a

competing line of medicines.  *See* Compl. ¶¶ 97-157.  Plaintiffs now move, pursuant to Rule 65

of the Federal Rules of Civil Procedure, to enjoin Defendants from selling SALIVEA altogether

or, at a minimum, from using the BIOTENE mark in advertising SALIVEA.  *See* Docket No. 28;

*see also* Docket No. 35 ("Pls.' Mem."), at 23-24.  Defendants oppose Plaintiffs' motion, and

cross-move to dismiss for lack of jurisdiction or, in the alternative, to transfer this case to the

United States District Court for the Central District of California.  *See* Docket No. 39.  For the reasons that follow, Plaintiffs' motion is GRANTED in part and DENIED in part, and Defendants' cross-motion is DENIED.

**BACKGROUND**

Laclede develops, markets, and sells a variety of over-the-counter and prescription medications.  *See* Compl. ¶ 8.  Laclede is wholly owned by Defendant Michael Pellico, who also serves as the company's President and Chief Executive Officer, and Defendant Stephen Pellico, who also serves as the company's Vice President and Secretary.  *See id.* ¶¶ 9-11.  In 2008, the predecessor-in-interest to Plaintiff GlaxoSmithKline LLC entered into the APA with Laclede.  *Id.* ¶ 16.  Pursuant to the APA, Plaintiffs' predecessor-in-interest paid approximately $170 million for the intellectual property, formulae, and goodwill relating to eighteen Laclede products in the "BIOTENE" line.  *See id.* ¶ 18.  These products are over-the-counter medicines, including mouthwashes and toothpastes, used in the treatment of xerostomia, commonly known as dry mouth.  *Id.* ¶ 19.

Section 4.16 of the Asset Purchase Agreement is a non-compete provision.  Referring to Laclede as "Seller," Subsection (a) of that Section provides that, "for a period of three (3) years following the Closing Date, Seller agrees that they will not and will cause their respective Affiliates not to, directly or indirectly, (i) distribute and market; or (ii) supply any Third Party with any oral care product in the Territory (1) for the treatment of xerostomia or dry mouth, or (2) which uses enzymes."  APA § 4.16(a).  Subsection (b), meanwhile, states that "Laclede, Inc.'s sole shareholders, Michael Pellico and Stephen Pellico, also agree they will not, directly or indirectly, (i) distribute and market; or (ii) supply any Third Party with any oral care product in

2

the Territory (1) for the treatment of xerostomia or dry mouth, or (2) which uses enzymes." *Id.* § 4.16(b). "Territory" is defined, in turn, to mean "all countries in the world." *Id.* § 8.2, at 36.

To the extent relevant here, Plaintiffs took two actions after acquiring the rights to BIOTENE. First, they invested significant sums on advertising and promoting BIOTENE products; in 2017 alone, for example, they spent over $20 million. *See* Compl. ¶ 29. Their advertisements reached both ordinary consumers and healthcare professionals. *See id.* ¶ 30. Second, after "extensive research," Plaintiffs "determined that it was best to reformulate BIOTENE." *Id.* ¶ 33. In particular, they removed certain enzymes from BIOTENE products. *See id.* ¶ 34.

Around March 2018 — over three years after the Closing Date as defined in the Asset Purchase Agreement — Laclede introduced the SALIVEA line of products, a suite of over-the-counter medicines, including mouthwash and toothpaste, used to treat dry mouth. *See* Compl. ¶ 47. In April 2018, Defendants mailed fliers advertising SALIVEA to healthcare professionals. *See id.* ¶ 54. Defendants estimate that they sent "approximately 100,000 mailers . . . to [healthcare professionals] and others based on contacts generated at conventions and rebate recipients." Docket No. 41 ("S. Pellico Decl."), ¶ 26. Plaintiffs highlight two here, which the Court attaches as Exhibits A and B to this Opinion and Order for ease of reference. *See* Compl., Ex. C ("Toothpaste Mailer"); *id.*, Ex. D ("Mouthwash Mailer"). In the first, the Toothpaste Mailer, attached as Exhibit A, there is a green banner at the top in which the following words appear: "***Back Again!*** Salivary Enzymes and Components – ***Essential for Dry Mouth Care***." Just below that banner, the advertisement reads — in smaller typeface — "*From the Creators of ORIGINAL* **biotene**," with "**biotene**" appearing in a stylized font and featuring a water droplet in the center of the "o." Just below that, the largest text on the flyer declares: "SALIVEA utilizes

the same ingredients as the ***ORIGINAL Biotene***. *The **Proven** and **Loved** Formula!*" Finally, at the far left of the advertisement, running vertically in by far the smallest typeface on the flyer, the following words appear: "Biotene is trademark [sic] owned by GlaxoSmithKline."

In the second flyer, the Mouthwash Mailer, attached as Exhibit B, a header in all capital letters reads: "***DID YOU KNOW BIOTENE HAS CHANGED?***" Slightly below the header, the flyer states: "Over 35 years ago, Laclede developed Biotene enzyme toothpaste and mouthwash that became the ***#1 brand for dry mouth.*** Biotene was acquired by the GSK Company and was reformulated. After years of perfecting formulas, we now introduce **SALIVEA** mouthwash and toothpaste that utilizes the Proven Enzyme Technology as in the ***ORIGINAL*** Biotene." Meanwhile, in the top right, highlighted in red, the flyer lists "***CURRENT*** Biotene Changes," including "ENYZMES (*Removed*)," and "PARABENS (*Added*)," alongside a picture of a Biotene oral rinse bottle. A footer at the bottom of the flyer states: "***Back Again!*** Salivary Enzymes and Components – ***Essential for Dry Mouth Care***." Just above the footer, there is a comparison of the "**SALIVEA** Mouthwash Utilizing ***ORIGINAL Biotene*** Formula" with the "***ORIGINAL* Biotene** Formula / The #1 Recommended Brand for Dry Mouth." Finally, like the Toothpaste Mailer, the Mouthwash Mailer contains a small disclaimer that "Biotene is trademark [sic] owned by GlaxoSmithKline," running vertically on the far left of the flyer.

Plaintiffs also highlight various advertisements appearing on SALIVEA's website. *See* Declaration of Amardeep S. Kahlon ("Kahlon Decl."), Ex. 10.[1] In one, attached to this Opinion and Order as Exhibit C, SALIVEA declares: "It's Back! The Original Formula that made

---

[1] In accordance with their interpretation of the Court's Individual Rules and Practices, Plaintiffs submitted this and several other declarations and accompanying exhibits by email to the Court. Although Plaintiffs have not yet filed those declarations and exhibits on the docket, the Court directs Plaintiffs to do so in this Opinion and Order.

Biotene #1 for Dry Mouth." *Id.* ("Website"). In a smaller typeface just below that text, the website reads: "From the Creators of **biotene**," with "**biotene**" once against appearing in stylized script and featuring the water droplet. The website also displays text similar to that on the Mouthwash Mailer: "*Over 35 years ago*, our researchers developed an enzyme technology system that became *The #1 Treatment in The World for Dry Mouth Care.* Now, after years of perfecting formulas, we're proud to introduce the New **SALIVEA Dry Mouth Care Products**." Another page on the website reads: "Proven Enzyme Technology / **Over 35 years ago,** Laclede developed Biotene enzyme toothpaste and mouthwash that became The #1 Brand for Dry Mouth. Biotene was later acquired by the GSK Company and was reformulated. / We Listened! We brought back salivary enzymes . . . ." Here, too, a disclaimer appears, this time at the bottom of the page. It states as follows: "Biotene is trademark [sic] owned by GlaxoSmithKline."

As noted, Plaintiffs now move for preliminary injunctive relief. In particular, they seek relief with respect to both their contract claims and their trademark claims. With respect to the former, Plaintiffs seek an injunction prohibiting Defendants from selling, "offering for sale, distribution, advertising, promotion and marketing of SALIVEA." Pls.' Mem. 24. With respect to the latter, Plaintiffs ask the Court to enjoin Defendants from taking at least eight actions: (1) using "the blue-and-red BIOTENE logo"; (2) using "the BIOTENE Droplet"; (3) using "the words '#1 Brand for Dry Mouth,' 'It's Back,' 'Back Again,' 'Brought Back' or variations thereof"; (4) using "any images of the packaging for GSK's BIOTENE products"; (5) continuing to disseminate the Toothpaste Mailer and the Mouthwash Mailer;[2] (6) disseminating "any and all claims referencing Laclede's prior ownership of the BIOTENE brand, or Laclede's development

---

[2]    Defendants represent that they "have discontinued the transmission of any further mailers containing the original subject matter from the first 100,000 and will develop new language going forward." S. Pellico Decl. ¶ 26.

or creation of the original formulation for BIOTENE"; and (7) disseminating "any sales . . . material, in any media, using the BIOTENE trademark that is likely to confuse customers or [healthcare professionals] to believe that SALIVEA is a product of GSK" or that GSK "authorized or sponsored" SALIVEA.  *Id.*  at 24-25.  Finally, Plaintiffs request (8) that the Court "require Defendants to disclose prominently in any of their advertising mentioning BIOTENE that SALIVEA is not a product of GSK, and that SALIVEA is not an authorized successor or alternative to BIOTENE, or a replacement for BIOTENE."  *Id.* at 25.  Defendants oppose Plaintiffs' motion and, as noted, cross-move for dismissal based on lack of jurisdiction or, in the alternative, to transfer the case to the Central District of California.  *See* Docket No. 39.

## DEFENDANTS' MOTION TO DISMISS OR TRANSFER

The Court begins with Defendants' motion to dismiss or transfer because, if granted, it would moot Plaintiffs' motion for a preliminary injunction.  Defendants argue that the Court lacks personal jurisdiction over them and, thus, should dismiss the case in its entirety.  *See* Docket No. 43 ("Defs.' Mem."), at 4-8.  In the alternative, they contend that venue is improper in this District and that the Court should transfer the case to the Central District of California.  *See* *id.* at 8-10.  The Court will address each argument in turn.

### A.  Personal Jurisdiction

A plaintiff bears the burden of establishing personal jurisdiction over a defendant.  *See, e.g.*, *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  Where, as here, the parties have not engaged in discovery, a plaintiff seeking to defeat a motion to dismiss based on the lack of personal jurisdiction need only make a *prima facie* showing that jurisdiction exists.  *See, e.g.*, *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013) (per curiam).  That requires "an averment of facts that, if credited[,] would suffice" to establish that

jurisdiction exists. *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam) (internal quotation marks omitted). At this stage, a court must "credit" such an "averment of jurisdictional facts as true." *Id.* In addition, the allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits, which the district court may also consider. *See, e.g.*, *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727-28 (2d Cir. 2012). A court will not, however, "accept [a plaintiff's] conclusory allegations or draw argumentative inferences." *In re Terrorist Attacks on Sept. 11, 2001*, 392 F. Supp. 2d 539, 556 (S.D.N.Y. 2005) (internal quotation marks omitted).

Applying those standards here, the Court concludes that Defendants' motion falls short because they voluntarily consented to personal jurisdiction in this District through the APA. *See, e.g.*, *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 625 (2d Cir. 2016) ("[U]nlike subject matter jurisdiction, a party may simply consent to a court's exercise of personal jurisdiction: for example, an entity may contract or stipulate with another to permit proceedings in a state's courts, notwithstanding the remoteness from the state of its operations and organization."). In particular, the APA provides that "the Parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement *in any court of the United States of America sitting in New York City*, this being in addition to any other remedy to which they are entitled at law or in equity." APA § 8.12(a) (emphasis added). The "Parties" further agreed that they would "irrevocably and unconditionally submit[], for itself and its property, to the exclusive jurisdiction of any New York State court or federal court of the United States of America sitting in New York City . . . from any thereof, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby or for recognition or enforcement of any judgment relating

thereto." APA § 8.12(b). The APA defines "Parties" as Laclede and GlaxoSmithKline, and the APA was signed by both Pellicos on behalf of Laclede. *See* APA at 1, 43.

In light of the foregoing provisions, the Court plainly has personal jurisdiction over Laclede. In arguing otherwise, Defendants contend that Plaintiffs' "claims against Laclede do not arise from the APA." Defs.' Mem. 5. But through the APA's jurisdictional provision, Laclede consented to jurisdiction in this Court for any "action or proceeding arising out of *or relating to* [the APA] or the transactions contemplated [t]hereby." APA § 8.12(b) (emphasis added). And Plaintiffs' claims here obviously arise out of, or at least relate to, the precise transaction contemplated by the APA, namely Plaintiffs' purchase of Laclede's assets. *See* Compl. ¶¶ 97-157 (raising, *inter alia*, breach of contract, tortious interference with contract, breach of the implied covenant not to compete, and breach of the implied covenant of good faith and fair dealing). It is true that not all of Plaintiffs' claims are contract claims. *See, e.g.*, *id.* ¶¶ 143-47 (asserting a claim of false advertising in violation of Section 350 of the New York General Business Law). But "the Second Circuit has held that a contract-oriented forum selection clause does extend to tort claims between the parties if the claims 'ultimately depend on the existence of a contractual relationship between the signatory parties.'" *BMW of N. Am. LLC v. M/V Courage*, 254 F. Supp. 3d 591, 597 (S.D.N.Y. 2017) (quoting *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 714 F.3d 714, 724 (2d Cir. 2013)). That is the case here.

Defendants are on slightly firmer ground in arguing that the APA does not provide for personal jurisdiction over the Pellicos, if only because they are not "Parties" to the contract, but once again their arguments fall short. The Second Circuit has held that "the fact [that] a party is a non-signatory to an agreement is insufficient, standing alone, to preclude enforcement of a forum selection clause." *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir.

2009). "[I]n order to bind a non-party to a forum selection clause," however, "the party must be closely related to the dispute such that it becomes foreseeable that it will be bound." *BMW of N. Am.*, 254 F. Supp. 3d at 598 (internal quotation marks omitted); *accord Firefly Equities, LLC v. Ultimate Combustion Co.*, 736 F. Supp. 2d 797, 799 (S.D.N.Y. 2010) (collecting cases). *Firefly Equities* is particularly instructive here. In that case, the plaintiff brought suit against a company and its president, who held "approximately 17% of [the company's] outstanding shares." *Id.* at 800. Several of the plaintiff's claims arose out of a Memorandum of Understanding ("MOU") between the plaintiff and the defendant company. *See id.* at 798-99. The MOU provided for jurisdiction in the Southern District of New York, and it was signed by the president of the company on behalf of the company. *See id.* at 799. The Court held that it was "clear" that the individual defendant was "related to [the company] closely enough that he should be bound by the forum selection clause to which he agreed on [the company's] behalf." *Id.* at 800. Because the individual defendant "himself signed the MOU (albeit in his representative rather than individual capacity), it was — or should have been — foreseeable to him that the clause might have application to disputes arising under that agreement that also involved him." *Id.* So too here: Michael Pellico and Stephen Pellico are the President and Vice President of Laclede, respectively. Additionally, Plaintiffs allege, and Defendants do not dispute, that they are "the sole shareholders of Laclede." Compl. ¶ 11. It follows that they are "closely related" enough to the dispute to be bound by the APA's jurisdictional provision. Accordingly, the Court concludes that it has personal jurisdiction over Defendants.[3]

---

[3] Because the Court concludes that the APA's forum-selection clause validly provides for personal jurisdiction over Defendants, it need not analyze personal jurisdiction under New York's long-arm statute or the federal constitutional requirements of due process. *See, e.g.*, *Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc. v. Am. Boat Co., LLC*, No. 11-CV-6804 (PAE), 2012 WL 527209, at *2 (S.D.N.Y. Feb. 17, 2012).

## B. Venue

Because the forum-selection clause of the APA is valid and enforceable, it follows that venue is proper in this district. "In the typical case not involving a forum-selection clause, a district court considering" a motion to transfer venue "must evaluate both the convenience of the parties and various public-interest considerations." *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013). But "[t]he calculus changes . . . when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Id.* at 63 (internal quotation marks omitted). That is, "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases.'" *Id.* at 63 (alteration and internal quotation marks omitted). More specifically, "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 64. Thus, "a district court may consider arguments about public-interest factors only." *Id.*[4] Considering those factors here, the Court concludes that there is no basis to transfer. Notably, the only public-interest factor that Defendants identify favoring transfer is that "California courts . . . are better suited to adjudicate claims under California law than are courts in New York." Defs.' Mem. 10. But it is not yet clear that California law governs. *See* Docket No. 50 ("Pls.' Opp'n"), at 17-18. And even if Defendants are correct that it does, that factor standing alone does not make this case one of "the most exceptional" ones in which the forum-selection clause is not given controlling weight. *Atl. Marine*, 134 S. Ct. at 581 (internal quotation marks omitted).

---

[4]     Defendants' reliance on *Enjoy the City N., Inc. v. Stranger*, No. 3:08-CV-718 (TJM), 2008 WL 4107195 (N.D.N.Y. Aug. 28, 2008), is misplaced, as that case was decided before the Supreme Court's decision in *Atlantic Marine*.

# PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

The Court turns, then, to Plaintiffs' motion for a preliminary injunction. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985) (describing a preliminary injunction as "one of the most drastic tools in the arsenal of judicial remedies"). To obtain relief, the party seeking a preliminary injunction must show, by a preponderance of the evidence, "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 405-06 (2d Cir. 2011) (internal quotation marks omitted); *Brennan Ctr. for Justice v. U.S. Dep't of Justice*, No. 17-CV-6335 (KBF), 2019 WL 637424, at *2 (S.D.N.Y. Jan. 21, 2018); *see also Winter*, 555 U.S. at 20.[5]

Following the parties' briefs, the Court begins with the likelihood of success on the merits and then turns to the issue of irreparable harm.

## A. Likelihood of Success on the Merits

Plaintiffs contend that they are likely to succeed on the merits of both their contract claims, *see* Pls.' Mem. 6-10, and their trademark claims under the Lanham Act, *see id.* at 10-19. With respect to the former, Plaintiffs advance claims for "breach of the implied covenant not to solicit," Pls.' Opp'n 17, and breach of the express non-compete obligation in the APA, *see id.* at 14. The Court will address the contract claims first.

---

[5] The Court's findings of fact and conclusions of law at this stage do not preclude reexamination of the merits at a later stage of the litigation. *See, e.g.*, *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 644-45 (2d Cir. 1998).

## 1. Contract Claims

The parties dispute whether New York or California law applies to Plaintiffs' implied covenant claim. *See* Defs.' Mem. 15-17; Pls.' Opp'n 17-20. The Court need not resolve that choice-of-law issue, however, because even if New York law applies, as Plaintiffs contend, they are unlikely to succeed on the merits. In *Mohawk Maintenance Co. v. Kessler*, 419 N.E.2d 324 (N.Y. 1981), the New York Court of Appeals identified an "'implied covenant' to refrain from soliciting former customers following the sale of the 'good will' of a business. *Id.* at 328. This covenant, the Court explained, "must logically be regarded as a permanent one that is not subject to divestiture upon the passage of a reasonable period of time." *Id.* at 329. Indeed, the Court held that "the duration of defendant's duty to refrain from soliciting certain of plaintiff's customers is not in any way limited by the durational provisions contained in the express restrictive covenants or by the legal principle derived from [the Court's] cases that express covenants restricting competition must be reasonable in scope." *Id.* at 326. "The 'implied covenant' not to solicit former customers," the Court of Appeals later explained, "bars a seller from taking affirmative steps to directly communicate with [former customers]. A seller may not, for example, send targeted mailings or make individualized telephone calls to his former customers informing them of his new business ventures." *Bessemer Tr. Co., N.A. v. Branin*, 949 N.E.2d 462, 469 (N.Y. 2011) (citation omitted). Significantly, however, the implied covenant is not unlimited: "[A] seller of 'good will' who lawfully competes with a purchaser may advertise to the public. So long as such advertisement is general in nature — and not specifically aimed at the seller's former customers — it is permissible under New York law." *Id.*

Here, although the issue is a close one, the Court concludes that Defendants' actions are nearer to the permissible public-advertising end of the spectrum than to the impermissible

specific-targeting-of-former-customers end of the spectrum. In particular, Plaintiffs do not identify any specific former customers of Defendants that Defendants solicited after the express non-compete period in the asset purchase agreement lapsed. To the contrary, Plaintiffs' Complaint identifies advertisements "mailed to health care professionals, including dentists, *throughout the United States*." Compl. ¶ 54 (emphasis added). Similarly, a declaration submitted in support of Plaintiffs' motion alleges in only general terms that Defendants' "market[ed] SALIVEA through mailers sent to [health care professionals]." Kahlon Decl. ¶ 11. Plaintiffs also allege that Defendants made SALIVEA Products available nationwide (if not internationally) by selling them "on various websites, including[] www.amazon.com, and in various stores, including Walgreen's [*sic*] pharmacies." Compl. ¶ 50. For their part, Defendants claim — through a declaration from Stephen Pellico — that the advertisements "were not specifically aimed at Laclede's former customers." S. Pellico Decl. ¶ 28 (internal quotation marks omitted). Instead, Defendants claim, the advertisements were sent to health care professionals, "and consumers that have known us, personally and professionally, for many years." *Id.* The evidence may suggest — as Plaintiffs tellingly allege themselves — that Defendants solicited "the same *class* of customers." Compl. ¶ 129 (emphasis added). But more is required for Plaintiffs to prevail on their implied covenant claim.

The contrast between the facts of this case and the facts in *Mohawk Maintenance* and *Bessemer Trust Company* is telling. In *Mohawk Maintenance*, the defendant had, for two decades, built a list of customers for building maintenance services in the tri-state area. 419 N.E.2d at 325-26. The plaintiff purchased the defendant's business; shortly after the purchase agreement's non-compete clause expired, the defendant formed a new building maintenance company and "may have approached at least one of his former customers in an effort to lure its

patronage away from [the plaintiff]." *Id.* at 326. Thus, the Court explained that the "implied covenant . . . precludes [the seller] from approaching *his former customers* and attempting to regain their patronage." *Id.* at 328 (emphasis added). In *Bessemer Trust Co.*, the defendant was an investment manager to "high net worth" clients. 949 N.E.2d at 465. Pursuant to a purchase agreement, the plaintiff purchased the firm employing the defendant, and the defendant became a principal of the plaintiff's investment management firm. *See id.* The defendant became dissatisfied with his employment at the plaintiff's firm, and left to join a different investment management firm. *See id.* at 465-66. Several of the defendant's clients took their business from the plaintiff's firm to the defendant's new firm, prompting the suit. *See id.* at 466. Answering a certified question from the Second Circuit, the Court of Appeals explained that a seller may not "send targeted mailings or make individualized telephone calls to his former customers informing them of his new business ventures," but that a seller may "advertise to the public" so long as the advertisement is "general in nature . . . and not *specifically* aimed at the seller's former customers." *Id.* at 469 (emphasis added). Notably, in both cases, the Court analyzed whether the plaintiff had solicited *particular* former clients. Here, Plaintiffs identify no particular former clients of Defendants targeted by Defendants' mailers and advertisements. Instead, they rest on the general claim that Defendants targeted a certain "class" of customers. Compl. ¶ 129. That does not suffice.

Nor are Plaintiffs likely to succeed on the merits of their express covenant claim. That claim rests on the proposition that, while Laclede's obligations not to compete expire after three years, the Pellicos' obligations not to compete are perpetual. *See* Pls.' Opp'n 14. That proposition finds some superficial support in the language of Section 4.16 — because Subsection (a), which pertains to Laclede, expressly includes a three-year term, while Subsection (b), which

pertains to the Pellicos, does not — but the Court is unpersuaded for several reasons. First, as a general matter, "New York courts adhere to a strict approach to enforcement of restrictive covenants." *Am. Inst. of Chem. Engineers v. Reber-Friel Co.*, 682 F.2d 382, 386 (2d Cir. 1982) (footnote omitted). Thus, a "restrictive covenant will be 'rigorously examined,'" *id.* at 387 (quoting *Am. Broad. Cos., Inc. v. Wolf*, 420 N.E.2d 363, 367 (N.Y. 1981)), and a non-compete provision that is "vague and unspecific" will be deemed unenforceable, *Doynow Sales Assocs., Inc. v. Rocheux Int'l of N.J., Inc.*, 647 F. Supp. 2d 296, 311 (S.D.N.Y. 2009). Section 4.16(b) does not unambiguously establish a time-limited non-compete provision. For one, its terms — namely, that the Pellicos "*also agree*" — suggest that the parties intended that the non-compete provision governing Laclede would also apply to the Pellicos. For another, it would make little sense for Laclede and the Pellicos to be governed by different non-compete durations. Second, and in any event, the Court has some doubts that a time-limited non-compete would be enforceable under New York law. *See Gelder Med. Grp. v. Webber*, 363 N.E.2d 680, 683 (N.Y. 1977) (noting that "restrictive covenants" will be enforced "if they are reasonable as to time and area, necessary to protect legitimate interests, not harmful to the public, and not unduly burdensome" (citations omitted)). Given New York's "strict approach" to non-compete agreements, the Court concludes that Plaintiffs are not likely to succeed on the merits of their express covenant claims either.

## 2. Trademark Claims

Next, Plaintiffs assert that they are likely to succeed on the merits of their claim of trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). *See* Pls.' Mem. 10. Under that Section, Plaintiffs "must establish that [they] possess[] a valid, legally protect[a]ble mark and that defendant's subsequent use of a similar mark is likely to create

confusion as to the origin of the product at issue." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999). The latter inquiry is guided by "the eight-factor balancing test first articulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961)." *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 442 (S.D.N.Y. 2017). Those factors are: (1) the strength of the trademark; (2) the similarity of the marks; (3) the proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) the respective quality of the products; and (8) the sophistication (or lack thereof) of consumers in the relevant market. *Id.*; *see, e.g.*, *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005). Application of the *Polaroid* test is "not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Star Indus., Inc.*, 412 F.3d at 384.

In this case, application of the *Polaroid* test is complicated by Defendants' claim that they used Plaintiffs' marks in connection with "comparative advertising." Defs.' Mem. 20. That is because a defendant may "use a plaintiff's trademark to identify the plaintiff's goods so long as there is no likelihood of confusion about the source of the defendant's product or the mark-holder's sponsorship or affiliation." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 165 (2d Cir. 2016) ("*Int'l Info. Sys.*") (internal quotation marks omitted). The Second Circuit has observed that, in such cases of "nominative use" — that is, the "use of another's trademark to identify, not the defendant's goods or services, but the plaintiff's goods or services" — "many of the *Polaroid* factors are a bad fit." *Id.* at 165, 168. Thus, in such

cases, district courts should consider, "in addition to . . . each of the *Polaroid* factors," the

following three "nominative use" factors:

> (1) whether the use of the plaintiff's mark is necessary to describe both the
> plaintiff's product or service and the defendant's product or service, that is,
> whether the product or service is not readily identifiable without use of the mark;
> (2) whether the defendant uses only so much of the plaintiff's mark as is
> necessary to identify the product or service; and (3) whether the defendant did
> anything that would, in conjunction with the mark, suggest sponsorship or
> endorsement by the plaintiff holder, that is, whether the defendant's conduct or
> language reflects the true or accurate relationship between plaintiff's and
> defendant's products or services.

*Id.* at 168. Accordingly, the Court will address these three factors in addition to the standard

*Polaroid* factors.

### a. Strength of Plaintiffs' Marks

The first factor is the strength of the trademark. "[T]he strength of a mark depends

ultimately on its distinctiveness, or its origin-indicating quality, in the eyes of the purchasing

public." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004) (internal quotation marks

omitted). In addition, courts consider "both the mark's inherent distinctiveness, based on the

characteristics of the mark itself, and its acquired distinctiveness, based on associations the mark

has gained through use in commerce." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d

324, 333 (S.D.N.Y. 2013). Where, as here, the "mark is not a real word at all, but is invented for

its use as a mark," courts typically deem such marks as "inherently distinctive." *Lane Capital*

*Mgmt., Inc.*, 192 F.3d at 344.

Here, there is no dispute that the BIOTENE mark and the BIOTENE droplet are

conceptually and commercially strong. *See* Pls.' Mem. 12; Defs. Mem. 28. Moreover, Plaintiffs

"spent over $20 million on the advertising and promotion of BIOTENE products" in 2017 alone.

Pls.' Mem. 12. Instead, Defendants contend that the factor is an ill "fit" in a nominative use

case. *See* Defs.' Mem. 28. It may well be less relevant, but the Second Circuit has held that

nominative use considerations do not "replace the *Polaroid* test in this context" and that district courts should consider the nominative use factors "*in addition to* discussing each of the *Polaroid* factors." *Int'l Info. Sys.*, 823 F.3d at 168. Accordingly, the Court concludes that the first factor favors Plaintiffs, and will consider the relevance of this factor, in connection with the particular nominative use factors, after analyzing each factor individually. *Cf. Nat. Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 579 (2d Cir. 2005).

### b. Similarity of the Marks

The second factor is the similarity of the marks. "Similarity is a holistic consideration that turns on the marks' sight, sound, and overall commercial impression under the totality of the circumstances." *Coty Inc.*, 277 F. Supp. 3d at 446. Here too, Defendants concede, as they must, that the BIOTENE marks they use in their materials are identical to Plaintiffs' marks. *See* Defs.' Mem. 29. Instead, they direct the Court to consider the "comparative purposes" of their use of Plaintiffs' marks. *Id.* But that consideration is not part of the analysis under this prong of the *Polaroid* test. *See, e.g.*, *Nespresso USA, Inc. v. Africa Am. Coffee Trading Co. LLC*, No. 15-CV-5553 (LTS), 2016 WL 3162118, at *3 (S.D.N.Y. June 2, 2016) (noting under this factor, in a nominative use case, that the defendant "use[d] the stylized word mark 'Nespresso,' which is identical to the mark for which [the plaintiff] has trademark protection"). Moreover, it warrants mention that the materials identified by Plaintiffs prominently feature the "BIOTENE" marks in equal — if not larger — size and prominence to Defendants' SALIVEA marks. *See* Toothpaste Mailer; Mouthwash Mailer. Accordingly, this factor also favors Plaintiffs.

### c. Competitive Proximity and Bridging the Gap

The parties discuss together the third and fourth factors, which "address the proximity of the goods or services at issue and the possibility that the senior user will "bridge the gap" — that

is, expand the scope of its business and enter the market of the junior user. *Disney Enters., Inc. v. Sarelli*, 322 F. Supp. 3d 413, 434 (S.D.N.Y. 2018). As with the preceding factors, Defendants concede that as direct competitors with Plaintiffs, their products are necessarily in competitive proximity, and there is no gap to bridge. *See Hasbro Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 77 (2d Cir. 1988) ("Products which directly compete in the marketplace clearly warrant a finding of the highest degree of competitive proximity.").

### d. Evidence of Actual Confusion

The fifth factor is evidence of actual consumer confusion. Such evidence "may consist of anecdotal or survey evidence." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 672 (S.D.N.Y. 2016) (internal quotation marks omitted), *aff'd*, 720 F. App'x 24 (2d Cir. 2017). To rely on anecdotal evidence, a party must show "a probability of confusion . . . affecting numerous ordinary prudent purchasers." *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 523 (S.D.N.Y. 2008) (internal quotation marks omitted). The anecdotal evidence of confusion "must be of a type that could inflict commercial injury on the plaintiff in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 672 (internal quotation marks omitted). And, although statistical evidence is not strictly required, "the absence of surveys is evidence that actual confusion cannot be shown." *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 964 (2d Cir. 1996).

Here, Plaintiffs submit declarations from their employees and from healthcare professionals. In the former, Plaintiffs' employees identify communications from healthcare professionals in which the professionals, having received Defendants' mailers, express confusion about the relationship between Plaintiffs, BIOTENE, and SALIVEA. *See, e.g.*, Declaration of

Eric Fullbright ("Fullbright Decl."), ¶ 3 (reporting a conversation with an oral hygienist in which the hygienist stated "that she understood SALIVEA was a GSK product that was replacing BIOTENE"). In the latter, healthcare professionals themselves claim that they were confused by Defendants' mailers. *See, e.g.*, Declaration of Veronica Oullette ("Ouellette Decl."), ¶ 2 (declaring that, after receiving "a total of three mailers," the dental hygienist was "immediately confused as to whether [SALIVEA] was made by [Plaintiffs], because the mailer referenced that GSK had reformulated the BIOTENE formula"). All told, Plaintiffs provide seven declarations recounting around twenty instances of actual confusion.

In light of this evidence, the Court concludes that this factor favors Plaintiffs, but only slightly. Defendants claim that they sent "approximately 100,000 mailers" to healthcare professionals. Docket No. 40 ("M. Pellico Decl."), ¶ 36. Measured against that number, twenty reported cases of actual confusion are not a lot. And none of the declarations address confusion stemming from SALIVEA's website — the declarations only discuss Defendants' mailers. Nevertheless, even a small number of declarations can be revealing. In *Fun-Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993(2d Cir. 1997), the Second Circuit affirmed the district court's grant of a preliminary injunction where the plaintiff had proffered testimony from one of its employees regarding actual confusion of customers. "[W]hile noting that the showing of actual confusion was not overwhelming," the Court explained, the district court "found the statements sufficient to support a finding of actual confusion at the preliminary injunction stage of the proceedings." *Id.* at 1004. The Second Circuit also rejected the hearsay argument that Defendants make here. *see* Defs.' Mem. 30 n.8, holding that the statements of confusion were not hearsay because they were not introduced for the truth of the matter asserted (or, alternatively, would be admissible as evidence of state of mind). *Fun-Damental Too, Ltd.*, 111

F.3d at 1003-04.  Thus, the Court concludes that this factor weighs in Plaintiffs' favor, but only slightly.

### e.   Defendant's Intent and Evidence of Bad Faith

The sixth *Polaroid* factor is bad faith, which concerns "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Ret. Living Publ'g Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991) (internal quotation marks omitted).  There is no dispute, of course, that Defendants *knew* of Plaintiffs' marks.  Whether Defendants intended to capitalize on Plaintiffs' goodwill is another matter.  Reviewing the mailings as a whole, the Court concludes that there is at least some evidence of bad faith.  The Mouthwash Mailer, for example, references "BIOTENE" more times than it does SALIVEA.  *See* Mouthwash Mailer.  At the top of the mailing, in large, capital letters, Defendants state: "*DID YOU KNOW BIOTENE HAS CHANGED?*"  *Id.*  Below that heading, the main text is phrased in a way that leaves a reasonable reader confused about whether Laclede or GlaxoSmithKline manufactures SALIVEA: "Biotene was acquired by the GSK Company and was reformulated.  After years of perfecting formulas, *we* now introduce SALIVEA . . . ."  *Id.* (emphasis added).  Taken together, the heading and the main text could be easily be read to suggest that GlaxoSmithKline had reformulated BIOTENE and was repackaging it as SALIVEA.  Nowhere on the Mouthwash Mailer is it evident that SALIVEA is a Laclede, and not a GlaxoSmithKline, product.  And while the depiction of the SALIVEA bottle is indeed larger than the depiction of the BIOTENE bottle, the overall impression of the advertisement suggests an untruthful association between SALIVEA and BIOTENE, on the one hand, and between Laclede and GlaxoSmithKline, on the other.

The Toothpaste Mailer also evinces some bad faith. There too, the relationship between SALIVEA and BIOTENE is purposefully obscured. The mailer prominently declares that SALIVEA is "From the Creators of ORIGINAL biotene," (with "biotene" in its distinctive, stylized typeface), and states that "SALIVEA utilizes the same ingredients as the ORIGINAL Biotene – The Proven and Loved Formula." Toothpaste Mailer. Again, the advertisement does not clarify that Laclede and GlaxoSmithKline are separate entities or that SALIVEA is not related to BIOTENE. Instead, the advertisement leaves the inevitable impression that SALIVEA is a follow-on to, or an improved version of, BIOTENE made by the same manufacturer as "the ORIGINAL Biotene." Thus, the Court concludes that this factor also favors Plaintiffs. *See, e.g.*, *Coty Inc.*, 277 F. Supp. 3d at 455 (finding bad faith based, in part, on "the prominent use of [the plaintiff's] legends on [the defendant's] products).

### f. Quality of Defendants' Products

The seventh *Polaroid* factor calls for an examination of the respective quality of the products at issue. "Under this factor a court first examines whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Morningside Grp. Ltd. v. Morningside Capital Grp., LLC*, 182 F.3d 133, 142 (2d Cir. 1999). The parties do not devote much attention to this factor: Plaintiffs allege no more than that BIOTENE and SALIVEA are equal in quality, *see* Pls.' Mem. 18-19, while Defendants claim (and Plaintiffs do not dispute) that SALIVEA is a superior product because it contains "high-cost ingredients" — the enzymes that Plaintiffs removed when they reformulated BIOTENE, M. Pellico Decl. ¶ 21. The Second Circuit has explained that, in cases involving products of similar quality, this factor can cut in different directions. On the one hand, "[p]roducts of equal quality may tend to create confusion as to source because of that very similarity of quality."

*Morningside Grp. Ltd.*, 182 F.3d at 142. On the other hand, if the defendant "does not provide inferior [products]," such confusion "does not harm [the plaintiff's] reputation." *Id.* Both of these effects are plausible here. Accordingly, the Court concludes that the seventh factor is in equipoise and favors neither side.

### g. Consumer Sophistication

The eighth and final *Polaroid* factor is the "sophistication of the consumers and the degree of care likely to [be] exercised in purchasing the product." *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 420 (S.D.N.Y. 2002). Under this factor, courts are to consider "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Sports Auth., Inc.*, 89 F.3d at 965. Plaintiffs concede that "the parties' products are aimed at consumers suffering from dry mouth who likely take care, as a general matter, in making purchases of products designed to treat the condition." Pls.' Mem. 19. Additionally, Plaintiffs allege that Defendants' allegedly infringing advertisements are aimed at "dentists, dental and oral hygienists, and other healthcare professionals," because "a significant majority . . . of consumer decisions to begin purchasing and using oral healthcare products like BIOTENE are based on the recommendations of" such professionals. *Id.* at 2-3. Given that both the ultimate consumers and relevant intermediaries — healthcare professionals — are sophisticated, the Court concludes that this factor favors Defendants. Both groups of people "have a high degree of familiarity and sophistication concerning the market in which the [parties] operate." *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 43 (2d Cir. 2016). It "may be obvious to [the parties], notwithstanding similarity of trademarks, that a junior user's

activities have no relationship to those of the senior user." *Id.* Accordingly, this factor favors

Defendants.

### h. Nominative Use Factors

With that, the Court turns to the three nominative use factors:

(1) whether the use of the plaintiff's mark is necessary to describe both the
plaintiff's product or service and the defendant's product or service, that is,
whether the product or service is not readily identifiable without use of the mark;
(2) whether the defendant uses only so much of the plaintiff's mark as is
necessary to identify the product or service; and (3) whether the defendant did
anything that would, in conjunction with the mark, suggest sponsorship or
endorsement by the plaintiff holder, that is, whether the defendant's conduct or
language reflects the true or accurate relationship between plaintiff's and
defendant's products or services.

*Int'l Info. Sys.*, 823 F.3d at 168. The Court concludes that all three factors favor Plaintiffs.

First, it is plainly not "necessary" for Defendants to use Plaintiffs' mark to describe

SALIVEA. This is clear from the advertising on SALIVEA's packaging itself, which describes

the product as "dry mouth care"; notes that it "contains Salivary Enzymes"; that states that it

"Supports Saliva's Natural Defenses," "Loosens Plaque-Biofilm Where Germs Hide," and

"Freshens Breath Without Burning." Toothpaste Mailer; *see also* Mouthwash Mailer. None of

these descriptions of the product reference BIOTENE. Accordingly, considering these

descriptions together, the Court concludes that SALIVEA is "readily identifiable" without

reference to BIOTENE. *Int'l Info Sys.*, 823 F.3d at 168.

Second, Defendants have used more of Plaintiffs' mark than is necessary to identify

SALIVEA. In evaluating this factor, courts are to consider "whether the alleged infringer

step[ped] over the line into a likelihood of confusion by using the senior user's mark too

prominently or too often, in terms of size, emphasis, or repetition." *Id.* (brackets in original).

Plaintiffs have strong evidence on each of those metrics. As discussed above, the Mouthwash

Mailer mentions "BIOTENE" nine times — more than twice as many times as it mentions

SALIVEA.  Mouthwash Mailer.  It displays a picture of a BIOTENE bottle.  *Id.*  The Toothpaste

Mailer prominently displaces the stylized "BIOTENE" logo, and claims that SALIVEA is "From

the Creators of ORIGINAL biotene."  Toothpaste Mailer.  And the SALIVEA website displaces

the stylized "BIOTENE" logo, declaring: "It's Back! The Original Formula that made Biotene #1

for Dry Mouth."  Website 1.  In each of the advertisements identified by Plaintiffs, the

Defendants prominently and repeatedly display Plaintiffs' marks.  In doing so, they "go beyond

using the marks 'as is reasonably necessary to identify'" Plaintiffs' products.  *PACCAR Inc. v.

TeleScan Techs., LLC*, 319 F.3d 243, 256 (6th Cir. 2003) (concluding similarly where the

defendant used the plaintiff's "trademarks in its domain names, repeat[ed] the marks in the main

titles of the web sites and in the wallpaper underlying the web sites, and mimick[ed] the

distinctive fonts of the marks"), *abrogated on other grounds by KP Permanent Make-Up, Inc. v.

Lasting Impression I, Inc.*, 543 U.S. 111 (2004).

Third, Defendants have "suggest[ed] sponsorship or endorsement by the plaintiff holder"

and have obscured "the true or accurate relationship between plaintiff's and defendant's

products."  *Int'l Info. Sys.*, 823 F.3d at 168.  In analyzing this factor, courts "must consider

confusion regarding affiliation, sponsorship, or endorsement by the mark holder."  *Id.* at 169.

Applying that analysis here, the Court concludes that Defendants' advertisements suggest that

SALIVEA is a replacement for, or a follow up to, BIOTENE.  This is most evident in the

headlining text "*DID YOU KNOW BIOTENE HAS CHANGED?*" on the Mouthwash Mailer, as

well as is language stating that "*we* now introduce SALIVEA mouthwash . . . that utilizes the

Proven Enzyme Technology as in the ORIGINAL Biotene."  Mouthwash Mailer (emphasis

added).  That ambiguous language is also present on the SALIVEA website, in which

Defendants state that "Biotene was later acquired by the GSK Company and was reformulated.

*We* Listened!  *We* brought back salivary enzymes . . . ."  Website 5 (emphasis added).  It is not clear from either the website or from the Mouthwash Mailer that the "we" refers to Laclede, as opposed to GlaxoSmithKline.  The Toothpaste Mailer gives the same impression, advertising that the product is "From the Creators of ORIGINAL biotene" and that SALIVEA "utilizes the same ingredients as the ORIGINAL Biotene."  Toothpaste Mailer.  The use of the marks identified by Plaintiffs thus contributes to an overall impression that SALIVEA and BIOTENE are related and that GlaxoSmithKline is responsible for SALIVEA.

    **i.   Balancing the Factors**

    Reviewing the eight *Polaroid* factors, and "looking at the products in their totality," *Star Indus., Inc.*, 412 F.3d at 384, the Court concludes that six factors favor Plaintiffs (albeit one only slightly), that one factor is neutral, and that one factor favors Defendants.  That said, four of the six factors favoring Plaintiffs — the first four factors — are not particularly helpful in assessing the likelihood of confusion in a nominative use case.  *See Int'l Info. Sys.*, 823 F.3d at 168 (acknowledging that "many of the *Polaroid* factors are a bad fit" in nominative use cases).  Moreover, "the *Polaroid* inquiry is not a mere mechanical counting exercise."  *Coty Inc.*, 277 F. Supp. 3d at 456 (internal quotation marks omitted).  Nevertheless, because the *Polaroid* factors — even without the four factors that Defendants conceded, and which are "bad fit[s]" here — *and* all three nominative-use factors favor Plaintiffs, the Court concludes that there is a likelihood of consumer confusion.  That is, the Court concludes that, "looking at the products in their totality," Plaintiffs have met their burden at this stage to show that "consumers are likely to be confused."  *Int'l Info. Sys.*, 823 F.3d at 160 (internal quotation marks omitted).

## B. Irreparable Harm

As noted, in addition to demonstrating "the likelihood of success on the merits," Plaintiffs must also demonstrate "the likelihood of irreparable injury in the absence of . . . an injunction." *Malletier v Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005). In this case, Plaintiffs have demonstrated that they are likely to suffer such an irreparable injury in the form of "loss of reputation and goodwill." Pls.' Mem. 20. Specifically, Plaintiffs contend that, "[b]y . . . misappropriating GSK's trademarks, Defendants are not only trading on GSK's earned goodwill, but also are taking from GSK the ability to control its reputation and that of its BIOTENE products." *Id.* at 19. Courts in this district have regularly recognized that "[i]rreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010) (quoting *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985)); *see also U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540-41 (S.D.N.Y. 2011) (finding irreparable harm because of the risks to "reputation and goodwill"), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).

Notably, Defendants do not dispute that Plaintiffs' alleged injuries constitute irreparable harm.[6] Instead, Defendants contend that "monetary damages are available and readily calculable" and, accordingly, that preliminary injunctive relief is unnecessary. Defs.' Mem. 34.

---

[6]    That is not surprising, as Defendants appear to have waived any such argument by agreeing in the APA that "irreparable damage may occur in the event that any of the provisions of [the APA are] not performed in accordance with their specific terms or [are] otherwise breached." APA § 8.12(a).

As Defendants see it, Plaintiffs are "truly concerned about . . . the potential loss of sales." *Id.* But Defendants' claims are contradicted both by Plaintiffs' motion for injunctive relief, which identifies "loss of reputation and goodwill" as harms, Pls.' Mem. 20, and by case law in this Circuit, which makes plain that "money alone cannot make up for the company's unquantifiable losses of reputation and goodwill and resulting loss of customers," *Coty Inc.*, 277 F. Supp. 3d at 464 (internal quotation marks omitted); *see Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 335 (S.D.N.Y. 2011); *see also CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 781 (2d Cir. 2010) ("[W]e have upheld an award of injunctive relief where a movant claimed money damages that were hard to measure *plus* irreparable harm, including loss of reputation, goodwill and business opportunities." (citing *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004))).  Thus, Plaintiffs have sufficiently demonstrated irreparable harm.

## C.  Balance of the Hardships and the Public Interest

Applying *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), the Second Circuit held in *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), that, in trademark cases, courts must also consider "the balance of hardships between the plaintiff and defendant" and whether "the public interest would not be disserved" by the issuance of a preliminary injunction, *id.* at 80 (internal quotation marks omitted).  Here, the Court easily concludes that those factors favor a limited preliminary injunction.  Defendants face little or no hardship in refraining from overreliance on Plaintiffs' marks in advertising SALIVEA.  Indeed, Defendants represent that they have already discontinued the Toothpaste Mailer and Mouthwash Mailer, and they identify no resulting hardship from that decision.  *See* S. Pellico Decl. ¶ 26.  Moreover, as discussed above, Plaintiffs face ongoing risks to their reputation and goodwill from Defendants' violations of their trademark rights.  Further, a preliminary injunction limited to enjoining trademark violations

would not disserve the public interest.  *See, e.g.*, *Gen. Mills, Inc. v. Chobani, LLC*, 158 F. Supp. 3d 106, 121 (N.D.N.Y. 2016) ("It is self-evident that preventing false or misleading advertising is in the public interest."); *see also, e.g.*, *N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 524 (S.D.N.Y. 2013) ("[T]he public interest . . . will indeed be well served by ensuring that consumers do not purchase a product based on false advertising.").  Defendants' arguments to the contrary are largely limited to an injunction prohibiting them from selling SALIVEA altogether.  *See* Defs.' Mem. 35 ("[T]he preliminary injunction sought by GSK would put Laclede out of the dry mouth care business . . . ."); *id.* ("The public's interest is best served when there are multiple choices that are available . . . .").  But, because Plaintiffs failed to demonstrate a likelihood of success with respect to their contract claims, they are not entitled to such a broad injunction.  By contrast, Defendants do not — and, for the reasons stated above, could not — contend that a limited injunction prohibiting the misuse of Plaintiffs' marks would tip the hardships in Defendants' favor or would be against the public interest.

## D.  Scope of Relief

That leaves only the question of the appropriate scope of relief.  "The Court has broad discretion to fashion injunctive relief."  *Beastie Boys v. Monster Energy Co.*, 87 F. Supp. 3d 672, 680 (S.D.N.Y. 2015).  The "scope of the [preliminary] injunction must be drawn by reference to the facts of the individual case, reflecting a careful balancing of the equities," and "should enjoin only those uses that are likely to create appreciable confusion, and no more."  *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 26 (2d Cir. 2004) (internal quotation marks omitted).

As noted, because the Court has determined that Plaintiffs are not likely to succeed on their contract claims, Plaintiffs' request to enjoin "the sale, offering for sale, distribution, advertising, promotion and marketing of SALIVEA," Pls.' Mem. 24, is denied, as that relief

flows only from Plaintiffs' contract claims. But the Court agrees with Plaintiffs that they are likely to succeed on their trademark claims and, thus, that some limited injunction is appropriate. Plaintiffs seek eight specific prohibitions, including, for example, enjoining "all use of the blue-and-red BIOTENE logo," "all use of the words '#1 Brand for Dry Mouth, It's Back, 'Back Again,' 'Brought Back' or variations thereof," and "the dissemination of any and all claims referencing Laclede's prior ownership of the BIOTENE brand." Pls.' Mem. 24. Plaintiffs also request discontinuance of the Toothpaste and Mouthwash Mailers, but that request is moot, as Defendants have apparently already halted those advertisements. *See* S. Pellico Decl. ¶ 26.

Plaintiffs' requests for a range of particularized prohibitions is somewhat at odds with their call for the Court to reject Defendants' division of the advertisements into "discrete subsections," urging the Court instead to "take into account the totality of the SALIVEA Advertising." Pls.' Opp'n 21. Instead, Plaintiffs ask the Court, and the Court agrees, to examine the "synergistic impact of the interrelated uses of BIOTENE that GSK seeks to enjoin." *Id.*; *see also W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993) ("We must therefore look at the general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember."). Taking that holistic approach, the Court concludes that Plaintiffs' requested injunction is overbroad, because it would sweep beyond the trademark violations that the Court found in considering Defendants' advertisements as a whole. As Plaintiffs themselves recognize, a competitor may use a trademark if "necessary to identify a competing product." Pls.' Opp'n 22. Yet Plaintiffs' proposed injunction could "sweep in instances of nominative fair use." *Beastie Boys*, 87 F. Supp. 3d at 680.

For those reasons, the Court concludes that a more limited preliminary injunction is appropriate here. In particular, the Court orders that Defendants shall refrain from: all use of the

blue-and-red BIOTENE logo that is subject of U.S. Reg. No. 3,720,751, or any confusingly similar variation thereof; all use of any images of the packaging for BIOTENE products; and the dissemination of any advertising or packaging materials declaring that SALIVEA is a successor of, or replacement for, BIOTENE.  Defendants shall also refrain from making or using any advertisements that are substantially similar to the Toothpaste and Mouthwash Mailers.  This limited injunction is sufficient to "enjoin only those uses that are likely to create appreciable confusion, and no more."  *Sunward Elecs., Inc.*, 362 F.3d at 26.[7]

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Plaintiffs' motion for a preliminary injunction, and DENIES in its entirety Defendants' cross-motion for dismissal or, in the alternative, for transfer.  Unless and until the Court orders otherwise, Defendants shall file an answer **within three weeks of this Opinion and Order.**  Additionally, within **one week of this Opinion and Order,** Plaintiffs are directed to file on ECF all declarations and exhibits submitted to the Court by email of June 27, 2018.  Finally, the parties shall appear for an initial pretrial conference with the Court on **February 27, 2019, at 2:45 p.m.**, in Courtroom 1105 of the Thurgood Marshall United States Courthouse, 40 Centre Street, New York, New York.  In accordance with the Notice of Initial Pretrial Conference, *see* Docket No. 5, the parties shall file a joint letter and proposed Case Management Plan no later than the Thursday before the conference.

---

[7]     The Court concludes that Plaintiffs' request for an order requiring Defendants to turn over "a list of all recipients of the SALIVEA Toothpaste Mailer and SALIVEA Mouthwash Mailer," Pls.' Mem. 25, is overbroad and unnecessary, in light of Defendants agreement to discontinue those advertisements.  Whether Plaintiffs can obtain that information through discovery in the normal course is a question for another day.

The Clerk of Court is directed to terminate Docket Nos. 28 and 39.

SO ORDERED.

Dated: January 23, 2019
      New York, New York

JESSE M. FURMAN
United States District Judge

# EXHIBIT A

**Back Again!** Salivary Enzymes and Components – *Essential for Dry Mouth Care*

PRESORTED
STANDARD MAIL
U.S. POSTAGE
**PAID**
GLENDALE, CA
PERMIT # 443

# SALIVEA®
## DRY MOUTH CARE

AVAILABLE AT:
*Walgreens*

**Call Toll-Free:** 1 (877) 522-5333    **Visit Us at:** www.Salivea.com

\*\*\*\*\*\*\*\*\*\*\*\*\*AUTO\*\*ALL FOR AADC 325    55
NOEL SPURLOCK DDS
OR CURRENT OCCUPANT
4041 HIGHWAY 90
PACE FL 32571-1917

From the Creators of ORIGINAL
**biotene®**

*SALIVEA® utilizes the same ingredients as the* **ORIGINAL Biotene®**

*The* **Proven** *and* **Loved** *Formula!*

- Contains Salivary Enzymes with Fluoride
- Freshens Breath without Burning
- Loosens Plaque–Biofilm Where Germs Hide





**NEW**

SALIVEA®
DRY MOUTH CARE
EXTRA GENTLE
**TOOTHPASTE**
PROTECTS + MOISTENS
contains
**Salivary Enzymes** + Anticavity Fluoride
**Supports** Saliva's Natural Defenses
**Loosens Plaque–Biofilm\*** Where Germs Hide
**Freshens** Breath Without Burning
SOOTHING MINT with Xylitol & Calcium
NET WT 4.3 OZ (121.9 g)

\* Biotene is trademark owned by GlaxoSmithKline

# EXHIBIT B

# DID YOU KNOW BIOTENE®* HAS CHANGED?



**NEW SALIVEA®**
DRY MOUTH CARE

Over 35 years ago, Laclede developed Biotene® enzyme toothpaste and mouthwash that became the **#1 brand for dry mouth.** Biotene was acquired by the GSK Company and was reformulated. After years of perfecting formulas, we now introduce **SALIVEA®** mouthwash and toothpaste that utilizes the Proven Enzyme Technology as in the **ORIGINAL** Biotene.

## SALIVEA® Mouthwash Utilizing ORIGINAL Biotene® Formula

Purified Water, Xylitol, Propylene Glycol, Hydrogenated Starch Hydrolysate, Poloxamer 407, Hydroxyethylcellulose, Sodium Benzoate, Flavor (Peppermint Oil), Benzoic Acid, Disodium Phosphate, **Zinc Gluconate, Lactoferrin, Lysozyme, Lactoperoxidase, Potassium Thiocyanate, Aloe Vera, Calcium Lactate, Glucose Oxidase + Mutanase and Dextranase.**

**COMPARE**

## CURRENT Biotene® Changes

**! ENZYMES** *(Removed)*
**! ZINC GLUCONATE** *(Removed)*
**! CALCIUM** *(Removed)*
**! PARABENS** *(Added)*

Purified water, Glycerin, Xylitol, Sorbitol, Propylene Glycol, Poloxamer 407, Sodium Benzoate, Hydroxyethyl Cellulose, *Methylparaben, Propylparaben,* Flavor, Sodium Phosphate, Disodium Phosphate.

## ORIGINAL Biotene® Formula
The #1 Recommended Brand for Dry Mouth

Purified Water, Xylitol, Propylene Glycol, Hydrogenated Starch Hydrolysate, Poloxamer 407, Hydroxyethylcellulose, Sodium Benzoate, Flavor (Peppermint Oil), Benzoic Acid, Disodium Phosphate, **Zinc Gluconate, Lactoferrin, Lysozyme, Lactoperoxidase, Potassium Thiocyanate, Aloe Vera, Calcium Lactate, Glucose Oxidase.**

**Back Again!** Salivary Enzymes and Components - **Essential for Dry Mouth Care**




*Biotene is trademark owned by GlaxoSmithKline

# EXHIBIT C



HOME   WHY SALIVEA   ABOUT DRY MOUTH   WHERE TO BUY   PRODUCTS





# Advanced Salivary Technology for Dry Mouth Care

*Over 35 years ago*, our researchers developed an enzyme technology system that became *The #1 Treatment in The*

*World for Dry Mouth Care.* Now, after years of perfecting formulas, we're proud to introduce the New **SALIVEA® Dry Mouth Care Products**.

# Better Dry Mouth Care



Ideal for anyone experiencing serious dryness or having difficulty maintaining good oral hygiene.

*Based on our original enzyme formula containing:*

- **Restores & Supports** saliva's natural defenses

- **Loosens Plaque-Biofilm\*** where germs hide

- **Cleans and**

- Essential Salivary Enzymes
- Hydrating Moisturizers
- Xylitol Natural Sweetener

**Refreshes**
without burning

- **Moistens and Soothes**
  dry, irritated tissue

---

* with regular brushing and when part of a normal oral hygiene program

Customer Service Toll-Free: 1 (877) 522-5333



HOME    WHY SALIVEA    ABOUT DRY MOUTH    WHERE TO BUY    PRODUCTS



# Why SALIVEA

Laclede® developed SALIVEA® Dry Mouth
Care to effectively supplement saliva's natural
defenses with salivary enzymes and essential
moisturizers.

Because dry mouth has many causes,    most
people benefit from SALIVEA's complete
family of products.

## Proven Enzyme Technology



**Over 35 years ago**, Laclede developed Biotene®*enzyme toothpaste and mouthwash that became The #1 Brand for Dry Mouth. Biotene® was later acquired by the GSK Company and was reformulated.

We Listened! We brought back salivary enzymes: *Lysozyme, Lactoperoxidase, Lactoferrin, Glucose Oxidase, Dextranase*.



After years of perfecting formulas, we now introduce SALIVEA® Dry Mouth Care products that utilizes the Proven Enzyme Technology as in the ORIGINAL Biotene®.

*Biotene is trademark owned by GlaxoSmithKline

Customer Service Toll-Free: 1 (877) 522-5333



HOME    WHY SALIVEA    ABOUT DRY MOUTH    WHERE TO BUY    PRODUCTS





Available at:







If your Walgreens

does not carry the Salivea item you are looking for, the pharmacist can have it for you on the following business day.

If Walgreens is not your preferred pharmacy, simply ask your trusted pharmacist to order Salivea through their wholesaler.

Customer Service Toll-Free: 1 (877) 522-5333



HOME    WHY SALIVEA    ABOUT DRY MOUTH    WHERE TO BUY    PRODUCTS





## Extra Gentle MOUTHWASH

Salivea Dry Mouth Mouthwash contains 6 natural enzymes and with regular brushing can help loosen BioFilm/Plaque formation for a cleaner, fresher mouth. Enhanced moisturizers help soothe and moisten dry mouth tissues.

- Supports saliva's natural defenses

- Loosens plaque-biofilm* where germs hide
- Freshens breath without burning
- Soothing, Soft Mint formula

---



## Extra Gentle, Low Foaming TOOTHPASTE

You may not realize you suffer from   dry mouth until it causes serious dental problems. Only SALIVEA toothpaste contains natural salivary enzymes with maximum anticavity fluoride protection to help maintain   a healthy oral environment.

- *Supports*   saliva's natural defenses
- *Gently Cleans* and protects
- *Loosens Plaque-Biofilm** where germs hide
- *Freshens*   breath without burning



# Hydrating, Moisturizing MOUTH SPRAY

A refreshing solution that quickly diminishes dry discomfort, mouth odors and other symptoms of a dry mouth. Enhanced    with moisturizers and    natural enzymes to help maintain the ideal oral environment.

- *Supports*    saliva's natural defenses
- *Moistens & Relieves* symptoms of dry mouth
- *Gives Long Lasting* refreshing comfort

\* with regular brushing and when part of a normal oral hygiene program



Customer Service Toll-Free: 1 (877) 522-5333



HOME    WHY SALIVEA    ABOUT DRY MOUTH    WHERE TO BUY    PRODUCTS





# What is Dry Mouth?

*Xerostomia*, more commonly known as **Dry Mouth**, refers to the condition where the salivary glands in your mouth are no longer producing normal amounts of saliva to keep your mouth moisturized at healthy levels.

*Dry mouth can also be a change*

*in saliva's composition. Any change in saliva can alter its natural defenses.*

---



## Side Effects

**Dry Mouth** is common and most will experience it at one time in their life. If this problem turns chronic, you will encounter side effects such as, bad breath, hoarseness, dental decay, tooth sensitivity, difficulty in tasting, chewing and swallowing.

---



## Health Problems

This problem can be triggered by daily stress and hormone changes, but if Dry Mouth persists it can indicate an underlying health problem such as bacterial infections, diabetes or Sjogren syndrome and should consult a doctor about it.



Customer Service Toll-Free: 1 (877) 522-5333



# Causes of Dry Mouth

The Surgeon General's Report on Oral Health in America states that hundreds of prescription drugs and over-the-counter medicines are the cause of **Dry Mouth**!







# Over 300 Medications

Antidepressants, antihistamines, muscle relaxants, and high blood pressure medicines are those amongst the huge list of culprits. Because most people take some form of medication(s), everyone can benefit from the use of **Salivea**® products. *For a comprehensive list of over 300 medications that cause Dry Mouth, please consult the drug chart here.*



**Other Common Causes:**

- Cancer treatments - Chemotherapy, Radiotherapy
- Autoimmune diseases - Lupus, Sjogrens Syndrome
- Diabetes
- Hormonal changes - Menopause, Breast feeding
- Sleep apnea
- Bacterial infections





**Dry Mouth Symptoms That You May Have:**

- Dryness or a feeling of stickiness in your mouth
- Saliva that seems thick and stringy
- Bad breath
- Difficulty chewing, speaking and swallowing
- Dry or sore throat and hoarseness
- Dry or grooved tongue
- A changed sense of taste
- Problems wearing dentures



---

Customer Service Toll-Free: 1 (877) 522-5333







# Why Saliva is Important



The role of saliva is to facilitate chewing, swallowing and aid in digestion. The lubrication that saliva provides also helps wash away food particles that can cause infections and gum diseases.

*More Importantly*, saliva contains key components and essential enzymes that help inhibit harmful bacteria growth. If left unaddressed, this condition can lead to tooth decay, acid-buildup and eventual tooth loss .

**Any change in saliva can alter its the natural antibacterial defenses**.

Not only does the lack of saliva affect your general health, and the health of your gums and teeth, it also affects your appetite, taste and basic enjoyment of food!






Customer Service Toll-Free: 1 (877) 522-5333